Joe RUIZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 55691.

Court of Criminal Appeals of Texas,
Panel No. 2.

Feb. 21, 1979.

Rehearing En Banc Denied April 25, 1979.

Michael Anthony Maness and Ernesto
Valdes, Houston, for appellant.

Carol S. Vance, Dist. Atty., James C. Brough and Stu Stewart, Asst. Dist. Attys., Houston, for the State.

Before ODOM, PHILLIPS and DALLY, JJ.

## OPINION

PHILLIPS, Judge.

This is an appeal from a conviction for capital murder. The court, after the jury responded negatively to the second special issue presented under Article 37.071(b)(2), V.A.C.C.P., assessed the penalty at life imprisonment. See Article 37.071(e), V.A.C.C.P.

The evidence presented by the State in its case in chief showed clearly that the appellant, accompanied by two other individuals, entered the Crescent Food Market in Houston on June 22, 1974, at approximately 5 p. m., armed with handguns. One of the employees working in the rear area of the store testified that the appellant approached him with a drawn handgun and ordered him to the front of the store and to lie down. The appellant then took this employee's wristwatch and wallet. He identified a photograph of the appellant taken the following day as being representative of how the appellant appeared on the day of the offense. He testified that the appellant had a moustache, khaki pants, and a red shirt on at the time. He also identified two other photographs as representing the other two individuals who accompanied the appellant. After lying on the ground, the witness was stomped on the back of the head several times and did not observe any other incidents. Immediately following his hearing someone state, "No, you cannot have that. That is mine," he heard two shots. After inquiring and determining the robbers had left, the witness raised himself and discovered that the son of the owner had been shot in the right shoulder and a customer had been shot and killed in the store.

A cashier at the store during the time of the robbery testified that she noticed one of appellant's companions near the front door with a gun and as she turned around the other companion was in front of her with a gun. Immediately previous to this confrontation she observed the appellant go to the rear through a nearby aisle. She testified that the appellant came to the front of the store and took the bag with the money in it, but that she did not see both his hands and did not see any weapon at that time held by the appellant.

A second cashier at the food market testified that she was in another counter area with the son of the owner who was subsequently shot. One of the appellant's companions stood before them with a gun and ordered them to get down. This cashier did not see anyone other than this one robber and kept her head down throughout the incident.

The stockboy who was in the counter area with the second cashier testified that he was also ordered to get down on the floor, but looked up as the three robbers were leaving. He was told to get down and was then shot. He testified that he described his assailant as "kind of fat" with medium length hair, long sideburns and "possibly a moustache." He could not remember the color of the clothing worn by the assailant.

Police photographs taken the day following this incident of the three participants reflect that the appellant is the only individual with a moustache.

After the State and the defense stipulated that the weapon introduced into evidence as State's Exhibit No. 7 was the same weapon used in the robbery of the Crescent Food Market, used to kill the victim during the robbery, and recovered the next day from one of the participants in the robbery, direct testimony was adduced relating to the arrest of the individual from whom State's Exhibit No. 7, the murder weapon, was recovered. The owner of Early Roberts Famous Foods all night cafe testified that at approximately 3 a. m. on June 23, 1974, a buzzer rang in his office which indicated a robbery was in progress. As he exited his office he observed a plainclothed, off-duty police officer holding the robber up by the wall. It was at this time that

State's Exhibit No. 7 was seized from Bernadino Sierra, Jr., one of the three participants in the robbery of the Crescent Food Market.

Three police officers then testified to the recovery of State's Exhibit No. 8, a .22 caliber pistol, which appeared similar to that used during the robbery of the Crescent Food Market by one of the participants, and State's Exhibit No. 11, a wristwatch taken off the employee of the Crescent Food Market during the robbery. It was shown that these items of evidence were obtained by a cellmate of the three participants in the Crescent Food Market robbery from the Vargas household at 515 Wichmann.

The State then introduced evidence of two extraneous aggravated robberies committed prior to the arrest of Sierra referred to above. The first of these was committed at a Stop and Go convenience store between 2 and 2:15 a. m. when a man wielding a gun, identified as the appellant, ran into the store and announced that it was a holdup. He ordered the cashier to open the register and back up. The cashier testified that the appellant pushed him, tried to strike him on the head with his pistol and tried to knee him in the groin. He was then ordered into the back room to open a safe which he could not open and was then forced into the walk-in cooler of the store and to lie down on the floor with other customers. The witness testified that the appellant carried a long-barrel revolver similar to State's Exhibit No. 8. He identified the other male individual as Bernadino Sierra, Jr. A customer in the store at the time of the robbery testified and corroborated the cashier's testimony.

Testimony was then adduced that at approximately 2:20 a. m. the appellant approached two customers as they were beginning to enter a U-totem store, wielding a gun and ordering them inside. The appellant was accompanied again by an individual identified as Bernadino Sierra, Jr. The appellant was wielding a long-barrel pistol, while Sierra was holding a snub-nosed pistol similar in characteristics to a .38 caliber.

The witness was ordered to the floor and his wallet was taken.

A third extraneous offense was admitted into evidence. Guadalupe Garza testified that on May 28, 1974, she approached a young Latin American male, later determined to be Gilbert Moreno, in a Houston lounge and requested a ride home. Moreno agreed and drove Ms. Garza and her companion, Bernadino Sierra, Jr., to a location designated by Sierra on Brady Street. When they arrived at the Brady Street residence, Moreno was invited in by Sierra to drink some beer. The three entered the apartment and Ms. Garza and Moreno began talking on the living room couch while Sierra entered the bedroom. Shortly afterward, the appellant and one or two other individuals arrived at the apartment and entered the bedroom. Sierra then asked Moreno to come into the bedroom, at which time the witness heard a scuffle and a plea from Moreno telling the others to take his money but leave him alone. Ms. Garza entered the room and observed the other individuals present beating Moreno with their fists, feet, and a chair. She testified that she only saw the appellant strike Moreno with his fists. At this time the witness was given a knife and told to cut Moreno on the back. The men then took Moreno to his car and placed him in it. Sierra and Ms. Garza then departed with the unconscious and immobile Moreno to a dirt road area where Sierra took Moreno out of the car and placed him in front of the car. Sierra then drove the vehicle back and forth over the victim approximately three times. Sierra and the witness then went to a lounge in Houston and met the appellant and the others. The group then drove to Galveston and back to Houston where they ran out of gas and abandoned Moreno's vehicle.

All three extraneous offenses were admitted over timely objection by the defense. The State argued that the evidence on the extraneous offenses was admissible because their evidence on the substantive offense was equivocal as to the specific intent of the conspirators to commit murder and the extraneous offenses were relevant to show

common design, scheme, and conspiracy. It was also argued that the extraneous offenses were relevant to the question of whether the appellant, as a co-conspirator in the execution of the aggravated robbery, should have anticipated that someone would have been killed as a result of carrying out the conspiracy to commit aggravated robbery.[1] The State's position with regard to the prior extraneous offense of murder and its admissibility before the jury was that by showing the appellant to have been involved in a prior, violent, homicidal episode with Bernadino Sierra, Jr., one of the co-conspirators in the aggravated robbery, the appellant should have anticipated that Joseph Picinich or some other individual might have been killed in the course of committing that aggravated robbery.

◼ The essential elements of the offense appellant was charged with and the theory on which the prosecution proceeded are (1) the appellant conspired with others to commit an aggravated robbery and (2) one of the co-conspirators (3) intentionally or knowingly (4) caused the death of an individual (5) in the course of committing or attempting to commit the aggravated robbery (6) in furtherance of the unlawful purpose of the conspiracy and (7) which should have been anticipated as a result of carrying out the conspiracy.

◼ The evidence adduced from the employees and customers of the Crescent Food Market on the day of the offense indisputably disclosed that the appellant, acting in concert with two other identified individuals and brandishing a deadly weapon per se, committed aggravated robbery during which an individual was killed with a dead-

ly weapon. V.T.C.A., Penal Code, Section 7.02(b), eliminates any necessity on the part of the State to prove the appellant had any intent to kill Picinich. The evidence adduced from these witnesses would permit any jury to infer that the aggravated robbery was committed as a result of a conspiracy and that a murder should have been anticipated in the carrying out of the conspiracy to commit aggravated robbery.

Without addressing the question of whether the two subsequent extraneous aggravated robberies were admissible to show a conspiracy between the appellant and at least one of the other individuals involved in the aggravated robbery at the Crescent Food Market, we turn to appellant's second ground of error which challenges the introduction of the prior extraneous murder into evidence.

◼ As stated in *Albrecht v. State,* Tex.Cr.App., 486 S.W.2d 97, the first order of inquiry in determining whether any evidence is admissible is a comparison of the probative value and the prejudicial or inflammatory aspects of the evidence, if any. In determining the admissibility of extraneous offenses, the court must look to the "evidence which the State has to offer in proof of the essential elements of its case." *Id.* at 101. When the element the State bears the burden of proof on can "be inferred from the act itself" (*Id.* at 101), the State may not use extraneous offenses as circumstantial evidence of that element in its case in chief. Finally, the decision whether the introduction of an extraneous offense into evidence is reversible error is an ad hoc determination based on the merits of each case.

1. The State maintained throughout the course of this trial that they were prosecuting the appellant as a party to the offense of capital murder under the theory expressed in V.T.C.A., Penal Code, Section 7.02(b), which reads as follows:

(b) If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was

one that should have been anticipated as a result of the carrying out of the conspiracy. This was the theory of prosecution notwithstanding the allegation in the indictment which reads:

. . . JOE RUIZ . . ., heretofore on or about June 22, 1974, did then and there unlawfully intentionally cause the death of Joseph Picinich, hereafter called the deceased, by shooting him with a gun and that the said Defendant was then and there in the course of committing and attempting to commit aggravated robbery.

The inflammatory aspects of the murder testified to are great indeed. The facts showed a brutal beating in which the appellant was involved, as well as subsequent brutality against the victim by one of the co-conspirators in the aggravated robbery at the Crescent Food Market, outside the presence of the appellant. The dissimilarity in the modus operandi between the killing of Gilbert Moreno and Joseph Picinich detracts from its probative value on whether an individual present at a brutal beating should anticipate that one of his cohorts would shoot and kill another individual in the course of an aggravated robbery. The overall effect of the testimony concerning the murder of Gilbert Moreno goes more to show the appellant to be a brutal criminal in general. This is precisely the reason the general rule against the introduction of extraneous offenses was created. See *Rodriguez v. State*, Tex.Cr.App., 486 S.W.2d 355; *Ford v. State*, Tex.Cr.App., 484 S.W.2d 727; *Jones v. State*, Tex.Cr. App., 481 S.W.2d 900; *Jones v. State*, Tex. Cr.App., 479 S.W.2d 307; *Powell v. State*, Tex.Cr.App., 478 S.W.2d 95; *Albrecht v. State*, supra.

We conclude that the direct evidence of the appellant's participating in an aggravated robbery in concert with other individuals while brandishing a per se deadly weapon was uncontroverted direct evidence on the element of anticipation. There being no disputed or contested factual issue to which the prior extraneous murder offense was relevant, material, and admissible, the trial court reversibly erred in admitting this inherently prejudicial and inflammatory evidence before the jury at the guilt and innocence stage of this trial. The trial court's instruction to the jury in its charge limiting their consideration of the extraneous offenses to the essential elements of whether the murder was committed in furtherance of the unlawful purpose of the conspiracy or that the murder should have been anticipated as a result of carrying out the conspiracy did not cure the error. See *Walls v. State*, Tex.Cr.App., 548 S.W.2d 38. We cannot conclude that the evidence of this brutal prior murder did not affect the jury's determination of guilt or innocence.

In light of our disposition of appellant's second ground of error, we decline to address the other grounds of error raised.

The judgment of conviction is reversed and the cause remanded.