**Opinion issued August 26, 2014**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-00692-CR

———————————

**GIOVANNI MORA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 339th District Court**
**Harris County, Texas**
**Trial Court Case No. 1302920**

---

## MEMORANDUM OPINION

A jury found appellant, Giovanni Mora, guilty of the offense of capital murder.[1] Because the State did not seek the death penalty, the trial court, as

---

[1]     *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon Supp. 2013).

statutorily required, assessed appellant's punishment at confinement for life.[2]  In five issues, appellant contends that the evidence is legally insufficient to support his conviction and the trial court erred in denying his motions to suppress his videotaped statements and to declare the statute under which he was sentenced[3] unconstitutional[4] as applied to him.

We affirm.

### Background

Elizabeth Frye testified that on April 11, 2011, at around 9:00 p.m., her husband, the complainant Donald Frye, III, left their house, driving his father's BMW Z4, to return some rental movies to a "Redbox" self-service kiosk at a nearby Walgreen's drugstore.  When Mrs. Frye awoke shortly after 11:00 p.m., the complainant had not yet come to bed, but she presumed that he had stopped to visit his father, and she went back to sleep.  When she awoke again after 1:00 a.m., the complainant still was not in bed.  Because she was worried, she went outside to see if his car was in the driveway, where she found the complainant lying in the driveway dead, cold to the touch.  Mrs. Frye called for emergency assistance.

Harris County Constable's Office Corporal M. Cohen testified that he was dispatched to the complainant's house shortly after 1:00 a.m.  When he arrived, he

---

[2]     *See id.* § 12.31(a) (Vernon Supp. 2013).

[3]     *See id.*

[4]     *See* U.S. CONST. amend. VIII; TEX. CONST. art. I, § 13.

2

saw the complainant lying dead against the garage door, with half of his body under the front end of a Suburban parked in the driveway. Cohen found a very small entry wound on the complainant's chest and an exit wound on his back. The Fryes' neighbor, Scott Weddle, testified that at around 9:30 p.m. on April 11, 2011, he heard a "bang" and a car "race off." He did not investigate, but he later found a fired bullet in his backyard.

Harris County Sheriff's Office ("HCSO") crime scene investigator L. Holliday testified that he was dispatched to the complainant's house to investigate the murder. Upon his arrival, he found a set of keys to the BMW on the ground near the complainant. He noted that the complainant's wallet, which contained cash, was still in his pocket and he was still wearing his wedding band, watch, and necklace. Holliday also found a "fired 380 auto shell casing" on the driveway. Holliday further testified that he recovered, from the passenger-side door handle of the BMW, a fingerprint that he entered into the Automated Fingerprint Identification System ("AFIS"), which identified appellant as a match.

HCSO homicide investigator S. Miller testified that, based on the fingerprint, he and HCSO Sergeant C. Clopton and Deputy J. Viramontes went to appellant's house to talk with him. Appellant was not there, but Clopton left his card with someone at the house and asked that appellant call him. Later that day, appellant called Clopton and said that he wanted to talk with him. The deputies

drove back to appellant's house, and appellant agreed to go with them to the sheriff's office. During the drive to the sheriff's office, Miller explained to appellant that his choosing to talk with the deputies was "strictly voluntary" and he "didn't have to talk . . . if he didn't want to." Appellant responded that he "didn't have a problem with it" because he had not done anything wrong. At the station, Miller and Viramontes took appellant into an interview room, where they conducted a videotaped interview.

The State offered, and the trial court admitted into evidence, the videotape recording of appellant's interview. In the interview, Deputy Viramontes explained to appellant that his name had come up during the course of a criminal investigation and the deputies were trying to determine whether he was involved. When Viramontes asked appellant where he was the preceding Monday, the day of the murder of the complainant, appellant responded that he "was not going to answer any more questions" until he knew "what was going on." Appellant asked what he was accused of having done on Monday, and Viramontes explained that he had not been accused of anything. Rather, the deputies were trying to ascertain whether appellant was the "guy they were looking for." Appellant responded, "I'm not the guy you're looking for" so "we shouldn't do no more talking." And appellant added, "I'm ready to go home . . . [and] go back to sleep." Sergeant Miller then asked appellant whether he had been to Atascosita that week, and

4

appellant replied that he had not. After Miller explained that they were simply trying to clear him, appellant asked to use the restroom and call his sister. Miller agreed, and the three left the interview room.

When they returned, Deputy Viramontes told appellant that the complainant had been killed the preceding Monday night; the complainant drove a "little silver BMW" and was shot during a robbery attempt; the car had been washed earlier in the day; appellant's fingerprint "came up" when investigators dusted the car; and a witness had reported seeing "two black males right by the car in the driveway." Viramontes asserted that there was "no doubt" appellant was "in that area," and he asked appellant, "How can you explain why your fingerprints are on the car?" Appellant continued to assert that he was not present at the complainant's home and asked the officers to "show [him] something with [his] fingerprints."

When Sergeant Miller insisted that appellant was at the murder scene and told him that he needed to explain, appellant responded, "So what are we gonna do?" Deputy Viramontes then repeated that the deputies were giving appellant an opportunity to tell them what had happened. Appellant responded, "Okay, I don't want to talk. . . . Are y'all gonna take me downtown?" Viramontes again urged appellant to explain his "side of the story." Appellant responded, "I have no side of the story, because I wasn't there. And that's my story, and I'm sticking to it." Miller said, "You were there. Your prints put you there." Appellant then told the

5

officers to "show [him] something."  And Miller asked appellant if he would "man up" and tell what had happened if Miller showed him the laboratory report. Appellant responded, "Yeah."

Sergeant Clopton then showed appellant the laboratory report and asked, "Did you go there to kill someone or were you just there to rob someone?  These are two different realms.  I am not forcing you to squeal on anyone else, but your print is the only one we found on the car.  So, if you're not the shooter, you need to say who is," otherwise, "you're going to take this yourself."  Appellant asked, "Am I going to jail tonight?"  Clopton responded, "That depends on what you do. . . . The district attorney is going to see you as a witness if you say you didn't go there to shoot anyone and didn't know anything about a pistol. . . . Tell us why you went there, otherwise you're going down as the shooter.  It's you or him.  That's the decision you have to make.  If you don't out him, you could be charged with murder."

Sergeant Clopton then showed appellant a photograph of the complainant and asked, "Did you go there to shoot this man?"  Appellant replied, "No." Clopton then asked, "Did you know he was going to be shot?"  Appellant replied, "No."  And Clopton then asked, "Did you go there to rob that guy?"  And appellant replied, "Yeah.  I just wanted the car."

6

Appellant explained that on the night of the murder, he and his friend, "Little Bobby," later identified as Bobby Jones, were riding in a car driven by their friend, Bruce Taylor. The three men saw the complainant driving the BMW and followed him to his home. Before the complainant got out of the car in the driveway of his home, Jones approached, tapped a handgun on the driver's side window of the complainant's car, and then pointed the gun at the complainant. Appellant, who was on the passenger side of the complainant's car, said, "I want the car. Give me the keys." Appellant admitted that he put his hand on the passenger-side door handle, and he asserted that the complainant moved toward Jones as he got out of the car and Jones then shot the complainant. Appellant and Jones then ran back to Taylor, who was waiting nearby in his car.

Sergeant Clopton told appellant he had done well to tell his story, and appellant responded, "Regardless, I'm going to jail." Appellant then asked Sergeant Miller, "Can I go home?" And Miller responded, "I can't answer that yet." Miller explained that he had to call the district attorney, and he left the room.

When Sergeant Miller returned, he explained that because appellant had just told him that he was in involved in the robbery, he had to read him his legal rights before they could continue their discussion. Miller also said that he would let appellant call his sister and they could continue to talk afterwards, if appellant wished. Miller then read appellant his legal rights and asked him if he understood

7

them, and appellant replied that he did. And Miller asked appellant if he wished to continue talking, and he emphasized that it was up to appellant. Appellant replied that he did and said that, while riding around with Jones and Taylor, he had seen the complainant's car and said that he wanted it. He identified Jones from a photograph and signed that Jones was the person who shot the complainant. Miller then sought information from appellant on how to locate Jones and Taylor. The interview concluded, and the deputies booked appellant into jail just before midnight.

Tyler Crutcher testified that between 8:00 and 10:00 p.m. on the night of the murder, appellant, Jones, and Taylor had come to his apartment in Taylor's car. Crutcher noted that he and his roommate, Dillon Garrison, drank alcohol and smoked marijuana with appellant, Jones, and Taylor. While they were doing so, appellant held a handgun and waved it around, pulling the clip in and out. And Crutcher saw that appellant had bullets in the clip. Crutcher became uncomfortable and asked appellant, Jones, and Taylor to leave. Appellant then got up and said to Jones and Taylor, "Let's go hit a lick," which, Crutcher explained, meant to go and rob someone. Jones and Taylor got up and left with appellant, and it appeared to Crutcher that appellant was "in charge." Later that night, appellant, Jones, and Taylor returned to Crutcher's apartment, and appellant cleaned the handgun with his shirt.

8

Garrison testified that the handgun that appellant had been "swinging" around was a small-caliber, black gun with scratches on it. And he positively identified the gun in evidence as the one that the appellant had at the apartment on the night of the murder. Garrison explained that he saw appellant pull the gun from his waist, heard appellant say "they were going to go hit a lick," and heard Jones and Taylor agree to do so. When appellant, Jones, and Taylor returned to the apartment later that night, Jones said that they had robbed someone, and appellant said that they had shot someone. Appellant then pulled the handgun from his waistband and cleaned it.

Ramon Dixon testified that at some point in April 2011, appellant, Jones, and Taylor came to his house to talk with him. A few days later, he purchased the handgun, which he identified in evidence, from Jones. HCSO firearms examiner J. Dupre testified that it was his opinion that the spent casing recovered from the complainant's driveway and the bullet recovered from Weddle's porch had been fired from the handgun in evidence.

## Sufficiency of the Evidence

In his first issue, appellant argues that the evidence is legally insufficient to support his conviction because it is "undisputed" that he did not shoot the complainant and there is no evidence that he acted as a party to the offense. Specifically, he asserts that there is no evidence that he, "with the intent to commit

9

murder, solicited, encouraged, directed, aided or attempted to aid [Jones] in shooting the complainant." He also asserts that although there is evidence that he is guilty of the offense of robbery, there is no evidence that, " in an attempt to carry out the robbery," he "should have reasonably anticipated that a murder would occur as a result of the robbery."

We review the legal sufficiency of the evidence by considering all of the evidence "in the light most favorable to the prosecution" to determine whether any "rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 31819, 99 S. Ct. 2781, 2788–89 (1979). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). However, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Id.*

"Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to

establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). An inference, including one from circumstantial evidence, is a conclusion reached by considering other facts and deducing a logical consequence from them. *Id*. at 16. On the other hand, speculating is mere theorizing or guessing about the possible meaning of the facts and evidence presented. *Id*. A conclusion that has been reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt. *Id*. It is enough that the cumulative effect of all the incriminating facts is sufficient to support the conviction. *Id*. at 13.

A person commits the offense of capital murder if he intentionally commits murder in the course of committing or attempting to commit robbery. TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon Supp. 2013). A person commits murder if he "intentionally or knowingly causes the death of an individual." *Id*. § 19.02(b)(1) (Vernon 2011). A person commits robbery if, "in the course of committing theft and with intent to obtain or maintain control of . . . property, he intentionally, knowingly, or recklessly causes bodily injury to another; or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." *Id*. § 29.02(a)(1)–(2) (Vernon 2011). Theft is the unlawful appropriation of property with the intent to deprive the owner of the property. *Id.* § 31.03(a) (Vernon Supp. 2013).

"A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for [whom] he is criminally responsible, or by both." *Id.* § 7.01(a) (Vernon 2011). Each party to an offense may be charged with commission of the offense. *Id*. § 7.01(b). A person is criminally responsible for an offense committed by the conduct of another if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id*. § 7.02(a)(2) (Vernon 2011). Additionally, if, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, then all the conspirators are guilty of the offense actually committed, even if they had no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of carrying out the conspiracy. *Id.* § 7.02(b).

To determine whether an individual is a party to an offense, we may look to "events before, during, and after the commission of the offense" and rely on circumstantial evidence. *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012). "There must be sufficient evidence of an understanding and common design to commit the offense." *Id.* Each fact need not point directly and independently to the guilt of the defendant, as long as the cumulative effect of the facts are sufficient to support the conviction under the law of parties. *Id*. Mere

presence of a person at the scene, or even flight therefrom, without more, is insufficient to support a conviction as a party to the offense. *Id.* "The evidence must show that, at the time of the offense, the parties were acting together, each contributing some part toward[] the execution of their common purpose." *Ahrens v. State*, 43 S.W.3d 630, 633–34 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd); *see Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994).

Here, the trial court's charge to the jury authorized it to convict appellant of capital murder either as a principal actor or as a party to the offense. And the trial court instructed the jury on the law governing the conspiracy theory of culpability. *See* TEX. PENAL CODE ANN. § 7.02(b) (governing conspiracy theory of culpability). The jury returned a general verdict of "guilty" of the offense of capital murder as alleged in the indictment.

A defendant in a capital murder case may be convicted solely on a conspiracy theory of culpability contained in the jury charge. *Fuller v. State*, 827 S.W.2d 919, 932–33 (Tex. Crim. App. 1992). Thus, under section 7.02(b), the State did not have to prove appellant's intent to commit a murder; rather, to secure appellant's conviction for capital murder, the State simply had to prove that a murder occurred in furtherance of a conspiracy to carry out a different felony and appellant should have anticipated the offense of murder as a result of carrying out the conspiracy. *See id.*; *Ruiz v. State*, 579 S.W.2d 206, 209 (Tex. Crim. App.

13

1979) ("Section 7.02(b) eliminates any necessity on the part of the State to prove the appellant had any intent to kill [the victim].").

Although appellant concedes that "the evidence is sufficient to establish that [he] only intended to rob the complainant," he asserts that he was unaware that Jones had a firearm when they approached the complainant. He also asserts that there is "no evidence" that he "gave [Jones] the gun or in any way encouraged him to shoot the complainant." He argues, thus, that there is no evidence that he "should have reasonably anticipated that a murder would occur as a result of the robbery."

Crutcher testified that appellant, Jones, and Taylor were at his apartment sometime between 8:00 and 10:00 p.m. on the night of the murder. He saw appellant "waving" around a handgun, and he saw bullets in the clip of the gun. Garrison identified the handgun in evidence as the one that he saw appellant pull from his waist and swing around. Moreover, Crutcher and Garrison each testified that, just before leaving the apartment, appellant said to Jones and Taylor, "Let's go hit a lick." Jones and Taylor agreed and left with appellant, who seemed to be "in charge." From this evidence, the jury could have reasonably concluded that appellant, Jones, and Taylor agreed to commit a felony, namely a robbery with a firearm. *See id.*; *Ladd v. State*, 3 S.W.3d 547, 565 (Tex. Crim. App. 1999) (stating "conspiracy" under section 7.02(b) is "an agreement between two or more persons,

14

with intent that a felony be committed, that they, or one or more of them, engage in conduct that would constitute the offense").

The jury could have also reasonably concluded that appellant should have anticipated the offense of murder as a result of carrying out the conspiracy. The testimony of Crutcher and Garrison show that appellant himself had a loaded firearm when he instigated the agreement with Jones and Taylor to commit a robbery, and he took the firearm with him when he left the apartment with Jones and Taylor to commit the robbery. *See Love v. State*, 199 S.W.3d 447, 453 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (holding evidence that defendant had "some knowledge" co-conspirators would use guns in course of robbery sufficient to establish he should have anticipated possibility of murder as result of conspiracy); *see also Ruiz*, 579 S.W.2d at 209 ("Section 7.02(b) eliminates any necessity on the part of the State to prove the [defendant] had any intent to kill [the victim]."). Although appellant, in his videotaped statement, asserted that Jones had brought the handgun to the robbery, the jury, as the trier-of-fact, was free to believe the State's evidence and disregard appellant's statement. *See Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).

Finally, appellant's conduct after the incident supports an inference of his participation in a common design. *See Gross*, 380 S.W.3d at 186; *Ransom*, 920 S.W.2d  at 302 ("In determining whether the accused participated as a party, the

15

court may look to events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act."). Garrison testified that when appellant returned to the apartment, he pulled the handgun from his waistband and cleaned it with his shirt. Jones said that they had robbed someone, and appellant said that they had shot someone. Dixon testified that shortly thereafter, appellant and Jones came to his house, and, days later, Jones sold him the handgun. And HCSO firearms examiner Dupre testified that the bullet recovered from Weddle's back porch had been fired from the same handgun in evidence.

Viewing all of the evidence in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have reasonably found that appellant committed the offense of capital murder as a conspirator. *See* TEX. PENAL CODE ANN. § 7.02(b). Accordingly, we hold that the evidence is legally sufficient to support appellant's conviction.

We overrule appellant's first issue.

## Motion to Suppress Oral Statements

In his second issue, appellant argues that the trial court erred in denying his motion to suppress his videotaped statements because he was questioned "for two hours" without being advised of his legal rights. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (Vernon Supp. 2013); *Miranda v. Arizona* 384 U.S. 436, 86 S. Ct. 1602

16

(1966). He asserts that he was not "properly warned" until after he had "implicated himself in the crime." In his third issue, appellant argues that the trial court erred in denying his motion to suppress his videotaped statements because "the record establishes that [he] was intoxicated" at the time he made his statements and his "intoxication, coupled with the deputies' coercive tactic of failing to inform [him] of his *Miranda* and statutory warnings," rendered [his] statements involuntary. *See* TEX. CODE CRIM. PROC. ANN. art. 38.21, 38.22, § 6 (Vernon Supp. 2013).

We review a trial court's denial of a motion to suppress a statement under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review a ruling on a motion to suppress a statement for an abuse of discretion. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). We generally consider only the evidence adduced at the suppression hearing unless the parties consensually re-litigate the issue at trial, in which case we also consider relevant trial testimony. *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). We give almost total deference to a trial court's determination of historical facts, especially if those determinations turn on witness credibility or demeanor, and we review de novo the trial court's application of the law to facts not based on an evaluation of credibility and demeanor. *Gonzales v. State*, 369 S.W.3d 851, 854 (Tex. Crim. App. 2012); *Neal v. State*, 256 S.W.3d

17

264, 281 (Tex. Crim. App. 2008). At a suppression hearing, the trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility and may choose to believe or disbelieve all or any part of the witnesses' testimony. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). When, as here, the trial court makes findings of fact with its ruling on a motion to suppress a statement, we do not engage in our own factual review but determine only whether the record supports the trial court's factual findings. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). Unless a trial court abuses its discretion in making a finding not supported by the record, we will defer to the trial court's fact findings and not disturb the findings on appeal. *Cantu v. State*, 817 S.W.2d 74, 77 (Tex. Crim. App. 1991).

In his motion to suppress his videotaped statements, appellant asserted that they were "involuntary" and taken in "direct violation of [his] privilege against self-incrimination, guaranteed by the Fifth Amendment to the United States Constitution"; he was "not given a legally sufficient warning of constitutional and statutory rights as guaranteed by the United States Constitution and the Code of Criminal Procedure"; and he was "under the influence of controlled substances, intoxicated and unable to validly consent to giving a voluntary statement to law enforcement officers."

At a pre-trial hearing on appellant's motion, Sergeant Miller testified that AFIS had matched to appellant a fingerprint taken from the passenger-side door of the complainant's car. At the time of the murder, appellant was on parole for robbery, and Miller obtained appellant's address from the parole office. Miller, Sergeant Clopton, and Deputy Viramontes, all dressed in plain clothes, drove to appellant's house in unmarked cars. Appellant was not home, and Clopton left his card with the person who answered the door. Appellant later called Clopton at 7:20 p.m. that evening and said that he wanted to talk to Clopton. When the deputies returned to appellant's house, Miller waited in his car, and Clopton and Viramontes went to the door. A few minutes later, appellant came out to Miller's car with Clopton and Viramontes. Appellant, who was not physically escorted or handcuffed, got into the front passenger seat of Miller's car, and Viramontes got into the back seat. In the car, during the drive to the sheriff's office, Miller told appellant that he was not under arrest and his decision to talk to them was strictly voluntary. Appellant said that he did not mind talking with the deputies because he had not done anything wrong. Miller noted that appellant was articulate and seemed "normal."

After the men arrived at the sheriff's office at approximately 8:30 p.m., the deputies allowed appellant to use the restroom, and then Sergeant Miller took him to an interview room. Miller saw no signs of intoxication and did not smell

19

alcohol on appellant. After turning on a video camera, Miller and Deputy Viramontes began questioning appellant. Miller acknowledged that neither he nor the other deputies had read to appellant his legal rights. He explained that this was not required because appellant was not under arrest or in custody at the time. Miller recalled that although appellant said that he wanted to go home and go back to sleep, he did not clearly state that he wanted to end the interview. Appellant stayed engaged in their conversation and did not say, "Stop." After they had talked for about 45 minutes, with appellant maintaining that he had not been in the Atascosita or Humble areas on the night of the shooting, Miller and Viramontes decided to confront appellant with the fingerprint evidence. Miller told appellant that Mrs. Frye had told him that the BMW driven by the complainant had been washed early on the day of the murder and, thus, Miller wanted to know how appellant's fingerprint got on the passenger-door handle of the car. After appellant denied that his fingerprint was on the car, the deputies showed him the laboratory report. Appellant then admitted that he had gone to the complainant's house to rob him.

Sergeant Miller explained that at this point, at 10:45 p.m., he had probable cause to arrest appellant, and he read appellant his legal rights. Appellant then repeated his admission that he had gone to the complainant's home to rob him. Miller noted that prior to appellant's initial admission, based on the fingerprint

20

alone, the deputies could not have obtained an arrest warrant because "[a] fingerprint being on the outside of a car doesn't give a police officer probable cause to arrest anybody or charge [them] with anything." He further explained that the fingerprint did nothing more than give him "someone to go talk to." Miller noted that, throughout the process, appellant seemed frustrated because he wanted to know what the deputies knew before he said anything. Appellant used the restroom several times, was fed, and did not seem impaired.

Deputy Viramontes testified that appellant did not demonstrate any of the characteristics he, based on his training, would associate with an intoxicated person. Appellant did not have droopy eyelids, slurred speech, or poor balance.

At the conclusion of the hearing, the trial court denied appellant's motion to suppress his videotaped statements, specifically finding[5] that:

> [Appellant] voluntarily came to the Lockwood station to give a
> statement and was not in custody. And the pre-*Miranda* statements
> are admissible, because they were voluntarily made without
> compulsion or persuasion. And the defendant's post-*Miranda*
> statements are also admissible, because the defendant received the

---

[5] Article 38.22 requires a trial court, in "all cases" in which a question is raised as to the voluntariness of an accused's statement and in which the trial court finds the statement to have been voluntarily made and admissible, to "enter an order stating its conclusion as to whether . . . the statement was voluntarily made, along with the specific finding of facts upon which the conclusion is based," and the order must be "filed among the papers of the cause." TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (Vernon Supp. 2013). A trial court satisfies this requirement when, as here, it dictates its findings of fact and conclusions of law to the court reporter and they are subsequently transcribed and made part of the appellate record. *Mbugua v. State*, 312 S.W.3d 657, 668 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (citing *Murphy v. State*, 112 S.W.3d 592, 601 (Tex. Crim. App. 2003)).

*Miranda* warnings and knowingly, intelligently and voluntarily waived the rights set out in the warning prescribed by Article 38.22, Texas Code of Criminal Procedure. Additionally, the Court did not observe any appearance of intoxication.

Appellant asserts that the trial court erred in concluding that he made his statements voluntarily and was not in custody at the time he made them. The United States Constitution commands that no person "shall be compelled in any criminal case to be a witness against himself." The United States Supreme Court, in *Miranda v. Arizona*, set out warnings that must be communicated to a suspect to safeguard the constitutional privilege against self-incrimination during custodial interrogation. 384 U.S. at 467–79, 86 S. Ct. at 1624–30.

Similarly, Code of Criminal Procedure article 38.22 governs the admissibility of statements made by a defendant during custodial interrogation. *Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007) (citing U.S. CONST. amend. V). An oral statement is admissible against a defendant in a criminal proceeding if, among other things: (1) the statement was electronically recorded; (2) the defendant was given the warnings set out in section 2(a) of article 38.22 before the statement was made and it is included on the recording; and (3) the defendant "knowingly, intelligently, and voluntarily" waived the rights set out in the warnings. *Id.* These warnings are virtually identical to the *Miranda* warnings, except that *Miranda* does not require a warning that the accused "has the right to

22

terminate the interview at any time." *Id.* Warnings under *Miranda* and article 38.22 are required only when there is a custodial interrogation. *Id.*

A "custodial interrogation" is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* (citing *Miranda*, 384 U.S. at 444, 86 S. Ct. 1602). Unwarned statements obtained as a result of custodial interrogation may not be used as evidence by the State in a criminal proceeding during its case-in-chief. *Id.* Four general situations may constitute custody: (1) when the suspect is physically deprived of his freedom of action in any significant way; (2) when a law enforcement officer tells the suspect that he or she cannot leave; (3) when the law enforcement officer creates a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (4) when there is probable cause to arrest and the officer does not tell the suspect that he or she is free to leave. *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). In the first through third situations, the restriction upon freedom of movement must amount to the degree associated with an arrest rather than an investigative detention. *Id*. In the fourth situation, the existence of probable cause must be manifested to the suspect. *Id*.

A trial court's "custody" determination "presents a 'mixed question of law and fact.'" *Herrera*, 241 S.W.3d at 526–27. Therefore, we afford almost total

23

deference to a trial judge's "custody" determination when the questions of historical fact turn on credibility and demeanor. *Id.* at 527. Conversely, when the questions of historical fact do not turn on credibility and demeanor, we will review a trial court's "custody" determination de novo. *Id.*

In regard to appellant's argument that he made his statement involuntarily because he was intoxicated at the time, we note that Sergeant Miller testified that appellant was, at the time, articulate, seemed "normal," and did not seem impaired. And Deputy Viramontes testified that appellant did not demonstrate any of the characteristics he, based on his training, would associate with intoxication, such as droopy eyelids, slurred speech, or poor balance. In the trial court, appellant's counsel asserted only that appellant "look[ed] impaired" in his booking photograph, and he speculated that he was "probably" on "prescription medication." Appellant presented no evidence that he was intoxicated at the time he made his statements.

Appellant next argues that he was in custody from the outset of the deputies' questioning because "[t]he complainant lived in a predominantly white upper-class neighborhood," "[t]he complainant's vehicle had been washed the day of the shooting," and "appellant's fingerprint was located on the passenger door of the vehicle." Appellant asserts that "[t]his information alone provided the deputies with probable cause to arrest [him] for murder."

The mere presence of appellant's fingerprint on the outside of the complainant's car, which the evidence shows had been at a car wash, a golf tournament, and a Walgreen's drugstore on the day of the murder, without more, did not necessarily "provide[] the deputies with probable cause to arrest [appellant] for murder." *See Dowthitt*, 931 S.W.2d at 254 ("[C]ustody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to that degree associated with an arrest."); *Broussard v. State*, 658 S.W.2d 784, 785 (Tex. App.—Beaumont 1983, no pet.) (stating that "where the evidence is of a single fingerprint, there must also be proof, to a degree greater than a mere probability or a strong suspicion, tending to establish that the party charged was the person who committed the offense or was a participant"); *see also Phelps v. State*, 594 S.W.2d 434, 436 (Tex. Crim. App. 1980) (focusing on general accessibility of surface); *Rogers v. State*, No. 01-95-00563-CR, 1997 WL 282266, at *3 (Tex. App.— Houston [1st Dist.] May 29, 1997, pet. ref'd) ("Where fingerprints are the only incriminating evidence, courts are likely to sustain the conviction when the prints are on the inside. . . . However, when prints are found on the outside, there must be other evidence implicating the defendant.").

Finally, appellant argues that he was in custody at the time he first admitted to his involvement in the robbery because the deputies did not tell him, during the

25

recording of the videotape, that he was free to leave or why they were questioning him. He also asserts that the deputies did not terminate the interview when he said, "I don't want to talk," and they interrogated him for two hours before reading him his legal rights.

The record shows that appellant telephoned Sergeant Clopton and stated that he wanted to speak with the deputies. Clopton, along with Sergeant Miller and Deputy Viramontes, went to appellant's house twenty minutes later in plain clothes and unmarked cars. When they arrived, appellant voluntarily accompanied them back to the sheriff's office. Voluntarily accompanying law enforcement to a police station for questioning does not, in and of itself, constitute custody. *Id*. However, simply because an interrogation begins as "noncustodial" does not preclude custody from arising later if police conduct causes a "consensual inquiry to escalate into [a] custodial interrogation." *Id*.

During questioning, Sergeant Miller urged appellant to explain why his fingerprint was on the car driven by the complainant on the night he was murdered, and appellant responded, "So what are we gonna do?" Deputy Viramontes explained that they were trying to give him a chance to explain. Appellant then said, "Okay, I don't want to talk," and he asked if the deputies were going to "take [him] downtown." Miller repeated that they were trying to give appellant a chance to tell his "side of the story." And appellant responded, "I have no side of the

story, because I wasn't there. And that's my story, and I'm sticking to it." Miller then said, "You were there. Your prints put you there." Appellant then asked the deputies to "show [him] something." At that point, Miller asked appellant whether he was going to "man up" and tell what had happened if Miller showed him the laboratory report. Appellant responded, "Yeah."

Sergeant Clopton then showed appellant the laboratory report, and appellant admitted that he had gone to the complainant's house to rob him because he wanted the car that the complainant was driving. And he asserted that Jones shot the complainant. Appellant then asked whether he could leave and go home. Sergeant Miller responded that he needed to contact the district attorney, and he left the room. When he returned, Miller read appellant his legal rights. Afterwards, appellant reiterated that he wanted the car that the complainant was driving and Jones shot the complainant. The deputies then arrested appellant and booked him into jail.

In *Estrada v. State*, detectives went to the defendant's apartment to question him about a murder that had occurred earlier in the day. 313 S.W.3d 274, 289 (Tex. Crim. App. 2010). The defendant followed the detectives out of his apartment and said that he wanted to give a statement. *Id.* The detectives informed the defendant that he did not have to give a statement and he was not under arrest. *Id.* Asserting that he had nothing to hide, the defendant decided to

27

ride with the detectives to a police station, where the detectives took the defendant to an interview room. *Id.* Although, unlike the instant case, the defendant in *Estrada* was informed of his *Miranda* rights when he arrived at the police station, the Court explained that these warnings were not required at that point because the defendant was not in custody. *Id*. at 289–90, 296.

For over three hours, the defendant in *Estrada* continued to deny any involvement in the murder, although he eventually admitted that he had had a sexual relationship with the complainant. *Id.* at 290. An investigator told the defendant that he was free to leave, and the defendant acknowledged that he was there voluntarily. *Id.* Finally, the defendant told the investigator that he did not want to continue talking and he wanted the officers to give him a ride home. *Id.* However, the defendant then became emotional and confessed to the murder. *Id.* at 292. Police officers then took the defendant home and, hours later, obtained a warrant for his arrest. *Id.*

In *Estrada*, the trial court denied the defendant's motion to suppress his recorded statement, finding that he was not in custody when the statements were made. *Id.* at 293. The Texas Court of Criminal Appeals agreed, noting that "[i]n determining whether an individual [is] in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there [is] a formal arrest or restraint on freedom of movement of the

degree associated with a formal arrest." *Id.* at 294 (citing *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526 (1994); *Dowthitt*, 931 S.W.2d at 254 ("A person is in custody only if, under the circumstances, a[n objectively] reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest.")). And the Court explained that

> a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody."

*Id.* (quoting *Oregon v. Mathiason*, 429 U.S. 492, 493–96, 97 S. Ct. 711 (1977)). Further, when a defendant is not in custody, law enforcement officials have no obligation under *Miranda* to honor a request to terminate questioning. *Id.* at 296.

Here, as in *Estrada*, appellant was not initially in custody. He contacted Sergeant Clopton and said that he wanted to talk to him; voluntarily went to the sheriff's office to talk; was not handcuffed; and was permitted to use the restroom and contact his sister. Although the deputies did not, during the videotaped statement, tell appellant that he was free to leave, the evidence shows that Sergeant

29

Miller explained to appellant during the drive to the sheriff's office that talking with the deputies was "strictly voluntary." And appellant said that he did not mind talking with them because he had not done anything wrong. Further, during the interview, appellant did not unequivocally ask or attempt to leave. *See Marshall v. State*, 210 S.W.3d 618, 628 (Tex. Crim. App. 2006). And right after he stated, "I don't want to talk," appellant asked Miller to show him the fingerprint report.

From the evidence presented, the trial court could have reasonably concluded that appellant was not in custody at the time he initially admitted that he had gone to the complainant's house to rob him. *See Dowthitt*, 931 S.W.2d at 256–57. And the record shows that at that point, Sergeant Miller left the room, contacted the district attorney's office, and came back and read appellant his legal rights. Appellant then stated that he understood his rights, but wished to continue talking and again admitted to going to the complainant's house to rob him.

Having examined all of the circumstances surrounding the interrogation of appellant prior to Sergeant Miller reading appellant his legal rights, nothing suggests a restraint on appellant's freedom of movement of the degree associated with a formal arrest. *See Estrada*, 313 S.W.3d at 293, 295. Accordingly, we hold that the trial court did not err in denying appellant's motion to suppress insofar as it pertained to his oral statements made prior to the reading of his legal rights. Further, that the interrogation may have taken place in a "coercive environment"

does not require a contrary conclusion. *See id.* at 295. This resolves appellant's claims that law enforcement failed to honor any invocation of his right to silence he might have made at that point. *See id.* at 294. And because appellant's statement was non-custodial, his assertion that an improper "two-step" interrogation process was employed does not apply. *See Ervin v. State*, 333 S.W.3d 187, 213–14 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). We further hold that the trial court did not err in denying appellant's motion to suppress insofar as it pertained to his oral statements made after the reading of his legal rights because, after his rights were read to him, he stated that he understood them and wanted to continue talking.

We overrule appellant's second and third issues.

## Punishment

In his fourth and fifth issues, appellant argues that his mandatory life sentence without the possibility of parole, pursuant to Texas Penal Code section 12.31, constitutes cruel and unusual punishment in violation of the United States and Texas Constitutions as applied to him because he was only eighteen years of age at the time he committed the offense, and a "mandatory sentence of life without parole for an 18-year-old defendant . . . is akin to a death sentence." *See* U.S. CONST. amend. VIII; TEX. CONST. art. I, § 13.

We review the constitutionality of a criminal statute de novo, as a question of law. *Moloney v. State*, 294 S.W.3d 613, 626 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). When presented with a challenge to the constitutionality of a statute, we presume that the statute is valid and the legislature has not acted unreasonably or arbitrarily. *Rodriguez v. State*, 93 S.W.3d 60, 69 (Tex. Crim. App 2002). The party challenging the statute has the burden to establish its unconstitutionality. *Id.* We must uphold the statute if we can apply a reasonable construction that will render it constitutional. *Ely v. State*, 582 S.W.2d 416, 419 (Tex. Crim. App. [Panel Op.] 1979); *Moloney*, 294 S.W.3d at 626 (stating that if statute can be interpreted in two different ways, one of which sustains its validity, we apply interpretation that sustains its validity).

Section 12.31 requires that "[a]n individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty . . . be punished by imprisonment in the Texas Department of Criminal Justice for . . . life without parole." TEX. PENAL CODE ANN. § 12.31(a) (Vernon Supp. 2013).

Appellant argues that section 12.31, as applied to him, violates the Eighth Amendment and Article I, Section 13, of the Texas Constitution because it did not allow the jury the opportunity "to hear and consider mitigating evidence and potentially render a sentence less than life."

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. In *Harmelin v. Michigan*, the Supreme Court rejected an Eighth Amendment challenge to a statutorily mandated sentence of imprisonment for life without parole. 501 U.S. 957, 996, 111 S. Ct. 2680, 2702 (1991). The petitioner argued that his sentence violated the Eighth Amendment because it was disproportionate to the narcotics possession offense of which he was convicted. *Id.* at 961, 111 S. Ct. at 2683. After noting that the "Eighth Amendment contains no proportionality guarantee," the Court expressly declined to extend "[p]roportionality review" outside the realm of "death penalty jurisprudence." *Id.* at 965, 994, 111 S. Ct. at 2686, 2701.

Likewise, the Court rejected the petitioner's argument that his sentence violated the Eighth Amendment because it was "cruel and unusual" to impose a mandatory sentence of life imprisonment without any consideration of mitigating factors such as the fact that he had no prior felony convictions. *Id.* at 994, 111 S. Ct. at 2701. The Court expressly declined to extend individualized death-penalty sentencing doctrine to an "individualized mandatory life in prison without parole sentencing doctrine." *Id.* at 995, 111 S. Ct. at 2701–02.

Appellant asserts that the Supreme Court recently departed from *Hamelin*, and he argues that this departure renders his sentence unconstitutional as applied to

33

him because he was only eighteen years of age at the time of the commission of the offense. *See Miller v. Alabama*, ––– U.S. ––––, 132 S. Ct. 2455, 2467–68 (2012). However, the Supreme Court, in *Miller*, specifically held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" *Id*. at 2460. The Court did explain that the mandatory nature of the penalty schemes before it prevented a sentence from taking into account the "mitigating qualities of youth" and posed "too great a risk of disproportionate punishment." *Id.* at 2466–69. And the Court did explain that sentencers must "take into account how children are different, and how those differences counsel against irrevocably sentencing [the juvenile offender] to a lifetime in prison." *Id*. at 2469. However, the Court's ultimate holding specifically applied to "those under the age of 18 at the time of their crimes." *Id.* at 2460.

Here, appellant concedes that he "was not a juvenile under the law when the incident occurred." He argues, however, that the Court's reasoning, as expressed in *Miller*, should apply to him as a young man, who was only eighteen years of age at the time he committed the offense, because "youth often-times lack the mental capacity and maturity to fully understand the consequences of their bad decisions." He implies that treating an eighteen-year-old differently than a seventeen-year-old is arbitrary: "Yet, what event occurs at the age of eighteen that results in one's

sudden ability to make better life decisions? Why, at 18, would a young man abruptly lose the ability to transform and turn his life around?"

Appellant poses important questions, but the Texas Legislature, in our Juvenile Justice Code, defines a child as a person who is either: "(A) ten years of age or older and younger than 17 years of age," or "(B) seventeen years of age or older and under 18 years of age who is alleged to have engaged in delinquent conduct . . . before becoming 17 years of age." TEX. FAM. CODE ANN. § 51.02(2)(A), (B) (Vernon 2014).

Moreover, the Supreme Court has recognized the "general differences between juveniles under 18 and adults." *Roper v. Simmons*, 543 U.S. 551, 569, 125 S. Ct. 1183, 1195 (2005). In holding that the Eighth Amendment prohibits the imposition of the death penalty on juvenile offenders under the age of eighteen, the Court explained that

> [d]rawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. . . . The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest.

*Id.* at 574, 125 S. Ct. at 1197–98.

Because the Supreme Court has held that the death penalty may be imposed on adults, those eighteen years of age or older, we hold that the mandatory life sentence required by Texas Penal Code section 12.31 does not violate the Eight Amendment as applied to appellant.

Article I, Section 13 of the Texas Constitution provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted. All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." TEX. CONST. art. I, § 13. Appellant argues that the "Texas Constitution provides an accused greater protection than the United States Constitution because it prohibits 'cruel *or* unusual' punishments," as opposed to "cruel *and* unusual" punishments," under the federal constitution. (Emphasis added.) However, the Texas Court of Criminal Appeals has specifically rejected the argument that this distinction requires that Article I, Section 13, be interpreted more expansively than the Eighth Amendment. *See Cantu v. State*, 939 S.W.2d 627, 645 (Tex. Crim. App. 1997).

Accordingly, we hold that the mandatory life sentence required by Texas Penal Code section 12.31 does not violate Article I, Section 13, of the Texas Constitution, as applied to appellant.

We overrule appellant's fourth and fifth issues.

**Conclusion**

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Sharp.

Do not publish.   TEX. R. APP. P. 47.2(b).