PD-0795-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 8/5/2015 1:22:53 PM
Accepted 8/6/2015 10:40:47 AM
ABEL ACOSTA
CLERK

**PD 0795-15**

# IN THE COURT OF CRIMINAL APPEALS

## OF TEXAS

---

**CARL LEE SMITH,**
*Appellant,*

**v.**

**THE STATE OF TEXAS,**
*Appellee.*

---

On Petition for Discretionary Review from the
Fourteenth Court of Appeals in No. 14-13-00595-CR
affirming the conviction in cause number 1247979,
From the 351st District Court of Harris County, Texas

---

APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

---

ORAL ARGUMENT NOT REQUESTED

**ALEXANDER BUNIN**
Chief Public Defender
Harris County, Texas

**JANI MASELLI WOOD**
Assistant Public Defender
Harris County, Texas
TBN. 00791195
1201 Franklin Street, 13th Floor
Houston, Texas 77002
Phone: (713) 368-0016
Fax: (713) 368-9278

Counsel for Appellant
July 30, 2015

## IDENTITY OF PARTIES AND COUNSEL

APPELLANT:                                   Mr. Carl Lee Smith
TDCJ# 1868764
Allred Unit
2101 FM 369 North
Iowa Park, TX 76367

TRIAL PROSECUTORS:          Merry Katherine McDaniel
Allison Baimbridge

APPELLATE PROSECUTOR:    Mr. Eric Kugler
Assistant District Attorneys
Harris County, Texas
1201 Franklin, 6th Floor
Houston, Texas 77002

DEFENSE COUNSEL AT TRIAL:  Charles A. Brown
708 Main Street, Suite 790
Houston, TX 77002

PRESIDING JUDGE:           Hon. Kent Ellis
JUDGE HEARING CASE      Hon. Mary Lou Keel
351st District Court
Harris County, Texas
1201 Franklin, 14th floor
Houston, Texas 77002

DEFENSE COUNSEL ON APPEAL: Mrs. Jani Maselli Wood
Assistant Public Defender
Harris County, Texas
1201 Franklin, 13th Floor
Houston, Texas 77002

# TABLE OF CONTENTS

Identity of Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Index of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Statement Regarding Oral Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Statement of the Case & Procedural History.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Ground for Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

> The warnings under *Miranda* and 38.22 specifically state that if a defendant is in custody "he has the right to have a lawyer present to advise him prior to and during any questioning" and "if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning." Mr. Smith was advised of his rights and when he questioned whether he had a lawyer, he was told no. Did the Court of Appeals err in holding that the rights afforded under TEX. CODE CRIM. PROC. ART. 38.22 and 1.051 (i) are not to be weighed against an "ambiguous" response?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Reason for Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Statement of Facts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Prayer for Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Appendix

INDEX OF AUTHORITIES

PAGE

**Cases**:

*Dinkins v. State*,
     894 S.W.2d 330 (Tex. Crim. App.1995). . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Edwards v. Arizona*,
     451 U.S. 477 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Lucas v. State*,
     791 S.W.2d 35 (Tex. Crim. App.1989). . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Pecina v. State*,
     361 S.W.3d 68 (Tex. Crim. App. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Smith v. State*,
     14-13-00595-CR, 2015 WL 3751776
     (Tex. App.—Houston [14th Dist.] June 16, 2015, no. pet. h.). . . . . . . 5, 20, 21

**Statutes and Rules**:

TEX. CODE CRIM. PROC. ART 1.051 (i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

TEX. CODE CRIM. PROC. ART. 38.22. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

TEX. R. APP. P. 66.3(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not requested.

STATEMENT OF THE CASE

This is an appeal from the offense of capital murder. (C.R. at 402). *See Tex. Penal Code Ann. § 19.03.* Mr. Smith pleaded not guilty and a jury convicted him; he was sentenced by the court to a mandatory sentence of life without parole because the State did not seek the death penalty. (C.R. at 402). Timely notice of appeal was filed. (C.R. at 405).

STATEMENT OF THE PROCEDURAL HISTORY

In an unpublished opinion, the Fourteenth Court of Appeals affirmed Mr. Smith's conviction. *Smith v. State*, 14-13-00595-CR, 2015 WL 3751776, at *13 (Tex. App.—Houston [14th Dist.] June 16, 2015, no. pet. h.). No motion for rehearing was filed. After an extension of time, this petition is timely if filed on or before August 17, 2015.

## GROUND FOR REVIEW

The warnings under *Miranda* and 38.22 specifically state that if a defendant is in custody "he has the right to have a lawyer present to advise him prior to and during any questioning" and "if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning." Mr. Smith was advised of his rights and when he questioned whether he had a lawyer, he was told no. Did the Court of Appeals err in holding that the rights afforded under TEX. CODE CRIM. PROC. ART. 38.22 and 1.051 (i) are not to be weighed against an "ambiguous" response?

## REASON FOR REVIEW

The Fourteenth Court of Appeals has decided an important question of state or federal law in a way that conflicts with the applicable decisions of the Court of Criminal Appeals or the Supreme Court of the United States. TEX. R. APP. P. 66.3(c).

STATEMENT OF FACTS

Around 1:00 a.m. on January 5th, 2009, Reynaldo Garza was escorting another employee of the illegal game room where he worked to her car near the corner of Wallisville and Uvdale Roads in Houston, Texas (IX R.R. at 119, 124). The game room was located in a small strip shopping center, which also housed a laundromat and a few other small businesses (Id.). While waiting for his coworker to get in her car, Mr. Garza heard what he "thought was like firecrackers" coming from behind the building (IX R.R. at 124-25). There were two bursts of sound, which his coworker said she believed to be gunshots, rather than firecrackers (IX R.R. at 124). Early the next morning, the body of Curtis Veazie was found behind the shopping center (IX R.R. at 88, 138). Mr. Veazie had been living out of his car following a dispute with his wife, and his car was later found in a utility right-of-way field not far from the scene (IX R.R. at 69, 97, 112).

While no one knows for sure what happened that night, the State's theory of the case was that a group of three to four men, including Cedrick Robinson (also known as "Turk"), an unidentified individual known only as "Junior," allegedly Carl Lee Smith (known to his friends as "Piper") and possibly Silvanus René (also known as "Lo") had committed the offense in the course of attempting to rob Mr. Veazie (XII R.R. at 63; X R.R. at 48). Mr. Smith maintained, however, that he was not

present at the time of the offense and had no part in it (XI R.R. at 185-86). Indeed, numerous witnesses put Mr. Smith away from the scene-attending a large family party-on the night of the murder (XI R.R. at 76, 111-12; XII R.R. at 11, 14, 37, 52-53). Mr. Smith had no knowledge of the crime until hours later (XI R.R. at 187).

The day after the incident, Mr. Smith received a call from "Junior," who informed him of what had happened the night before, and a large group of people, including Mr. Smith and his girlfriend, went out into the woods to see where Turk had "ditched" the car, causing a subsequent argument between Mr. Smith and Turk regarding Turk's stupidity in leaving the car so close to the Hunter Woods Apartments (XI R.R. at 187-88; XI R.R. at 115-16).

Following Mr. Veazie's murder and locating his car, the police focused their attention on the nearby Hunter Wood apartment complex, in part due to a tip called in to Crime Stoppers by Cheryl Shaw, who claimed to have seen blood on Turk's shoes later in the day on January 5th, and had a conversation with Turk in which he appeared agitated, and may possibly have referred to the crime in some way (X R.R. at 128-29, 130-31, 133). When the police arrived at the Hunter Wood apartment complex to investigate the Crime Stoppers tip, Mrs. Shaw initially refused to speak to the police-she only consented to speak with them after they placed her in handcuffs and put her into a police car in some apparent pretense of arresting her (X R.R. at

133-34).  She claimed to know who Mr. Smith was by sight, having seen him two or three times, but did not place him at the apartments or with the other suspects the night of the murder, and had no direct knowledge of his involvement (X R.R. at 139-40, 147, 151, 154).  At the time of her testimony, Mrs. Shaw was in custody at the Harris County Jail, and had been arrested previously on several theft and forgery charges (X R.R. at 115-16).

The only person who placed Mr. Smith at the complex with Turk and Junior the night of the murder was Mrs. Shaw's daughter, Whitney Shaw (X R.R. at 46, 48).  Whitney Shaw, however, admitted she had only ever seen the man she identified as Mr. Smith twice, including the night of the incident, and could not place a gun in his hands during her testimony (X R.R. at 38-39, 50-51, 60-61).  Ms. Shaw did not actually see the man she claims was Mr. Smith get in the car with Turk and Junior-she only saw him walk out the apartment door at the same time they did, not get in the car or leave the complex with them (X R.R. at 56, 66).  Moreover, Ms. Shaw could not even be certain that the night she claims to have seen Mr. Smith with Turk and Junior was, in fact, the night in question:

MR. BROWN:     So you can't tell this jury that the night before or the

night of the murder going into the 4th, 5th that you saw this man with

-9-

Turk and Junior getting dressed taking guns that that's the night of the murder. You don't know that, do you?

MS. SHAW: It's not that I don't know I just don't remember.

(X R.R. at 70-71).

Once the police had turned their attention to Turk, Junior, and Mr. Smith, they opted to interview Mr. Smith at the Harris County Criminal Courthouse, where they knew he was making a court appearance on another matter on January 14, 2009 (X R.R. at 192). When Sergeants Dean Holtke and Wayne Kuhlman of the Harris County Sheriff's Office Homicide Unit arrived to interrogate Mr. Smith, Mr. Smith was represented by counsel, attorney Anthony Simmons, on his pending case (XI R.R. at 39). Knowing that Mr. Smith was represented by counsel, the officers have the armed bailiff detain Mr. Smith without his counsel's knowledge and without allowing him to contact his counsel, bring Mr. Smith into a private jury deliberation room, outside of the public areas of the courthouse, where he is greeted by two armed Homicide detectives (XI R.R. at 33-34). Mr. Smith was informed he was not in custody, despite the fact he was detained in a private room with two armed officers in it and an armed bailiff guarding the door, and despite Sergeant Holtke admitting on the stand that Mr. Smith was a suspect:

-10-

MR. BROWN:        When you came and had the bailiff get Mr. Smith to come back and join you in the jury room he was a suspect in your mind. Is that correct?

SGT. HOLTKE:    His name had been mentioned.

MR. BROWN:        The answer to the question is, yes or no, he's a suspect or he's not?

SGT. HOLTKE:    He's suspect.

MR. BROWN:        So he's not a witness.  He's a suspect?

SGT. HOLTKE:    Right.

(XI R.R. at 33-34).

Sgt. Holtke recorded his interrogation of Mr. Smith (X R.R. at 193-94; State's Exhibit 98: Defendant's Statement of 1/14/09, Part 1).  At just over six minutes into the recording, which was played into evidence, Mr. Smith clearly requests his attorney:

MR. SMITH:        I need a-I need a lawyer, Sir.  I-my-can I-can I call my lawyer in here?

SGT. HOLTKE:    'Course you can.

MR. SMITH:        'Cause I really don't-you know what I'm sayin'-

SGT. HOLTKE:    'Course you can.

MR. SMITH:     I really-I-I know what's up, you know what I'm sayin'?

SGT. HOLTKE:   You do know what's up with this?

MR. SMITH:     Yes, Sir, you know what I'm sayin', but only thing is, you know what I'm sayin', they-you know-

SGT. HOLTKE:   If you-Dude-If you were there-

MR. SMITH:     -These people-

SGT. KUHLMAN:     Hey, hey, hey-

MR. SMITH:     -These people-

SGT. HOLTKE:   Hey-

MR. SMITH:     -These people that I'm dealin' with-

SGT. KUHLMAN:     Carl, Carl, Carl

SGT. HOLTKE:   Let him finish-He-he-he's talking

SGT. KUHLMAN:     OK.

MR. SMITH:     These people man, you know what I'm sayin'-I'm scared of these people, man, you know what I'm sayin'?

(State's Exhibit 98: Defendant's Statement of 1/14/09, Part 1, at 06:03).  While Sgt. Holtke and Sgt. Kuhlman indicate to Mr. Smith that he can get his attorney, they clearly do their best to keep him talking for as long as they can before actually

-12-

allowing him access to counsel. Later in the recording, at nine minutes and twenty-eight seconds, Mr. Smith unequivocally requests access to counsel again:

> MR. SMITH: Well, know, 'fore I say anything further man, you know what I'm sayin', I just really want to get my lawyer up in here-
>
> SGT. HOLTKE: Well, get him.
>
> MR. SMITH: -so I can understand what's going on.
>
> SGT. HOLTKE: I mean, you know, that's-
>
> SGT. KUHLMAN: Well, here-OK, then that's fine, but here's what I'm not understanding. I'm trying to follow what you're saying here. You're saying you were just told about this?
>
> MR. SMITH: Yeah, Turk just came and, you know, we was out (unintelligible) when he came and told us.

(State's Exhibit 98: Defendant's Statement of 1/14/09, Part 1, at 09:28). This time, when Mr. Smith requests access to his attorney before going any further, Sergeant Kuhlman clearly directs Mr. Smith's attention away from his request and effectively ignores it, diving straight into further questioning and again denying Mr. Smith access to his attorney. It is not until almost half an hour later that Mr. Smith is finally allowed to speak to his attorney, and only because Mr. Simmons came looking for him, not because the officers allowed Mr. Smith to go and get him (State's Exhibit 98:

-13-

Defendant's Statement of 1/14/09, Part 1, at 34:02). Following a short conference with his attorney, Mr. Smith agreed to continue speaking with the officers for the moment (State's Exhibit 99: Defendant's Statement of 1/14/09, Part 2, at 00:43). Later that same day, despite clearly knowing Mr. Smith was represented by counsel and had requested the presence of that counsel, Sergeants Holtke and Kuhlman meet with Mr. Smith again, this time to show him photographic arrays so he can identify Turk and Lo to them (State's Exhibit 100: Defendant's Second Statement of 1/14/09, at 02:48, 04:05).

No further contact was made with Mr. Smith until December 3rd, 2009, when Sergeant Holtke and Sergeant Eric Clegg interrogated Mr. Smith again while he was incarcerated at the Baker Street Jail in Houston, Texas on another offense (XI R.R. at 11-12). Mr. Smith was taken from his cell by a jail guard and brought to a small interrogation room, where he was confronted with Sgt. Holtke and Sgt. Clegg (XI R.R. at 12-13). Mr. Smith was shackled, with his hands cuffed behind his back and leg irons on his ankles, and felt unable to leave the room without the consent of the officers and the guard (XI R.R. at 175; State's Exhibit 101: Defendant's Statement of 12/3/09, at 00:28). Sgt. Holtke and Sgt. Clegg openly admitted in the interview that Mr. Smith was in custody during the interrogation, and Sgt. Holtke duly Mirandized him, saying: "Since you are in custody, you have leg irons and everything on, I'm going

to have to read you your warnings, which I'm sure you've heard before." (State's Exhibit 101: Defendant's Statement of 12/3/09, at 00:28).

Following the reading of his rights, Mr. Smith attempted to imitate his attorney's questions during his first interrogation in the Harris County Courthouse to end the interview, at which point Sgt. Holtke informed him that he did not have access to an attorney, despite his professed rights:

MR. SMITH: Am I being charged with something?

SGT. HOLTKE: No.

MR. SMITH: I got a lawyer?

SGT. HOLTKE: Nope. You're in custody-you're in custody for something completely unrelated to what I want to talk to you about, but since you're in custody, I have to lead-read you your legal warnings.

(State's Exhibit 101: Defendant's Statement of 12/3/09, at 01:05). Mr. Smith did not feel free to leave the room, did not believe that he had the ability to access an attorney, and clearly did not actually wish to speak to the detectives:

MR. BROWN: When you see the door open and the people there what do you do?

MR. SMITH: I tell him [the guard] I don't want to talk to him [Sgt. Holtke].

MR. BROWN:     Did they say OK and let you go?

MR. SMITH:     No, sir.  When I said I ain't want to talk to him he told me he couldn't you know do nothing about that, say he was just the escort.

MR. BROWN:     You say certain things at the beginning of your interview with Sergeant Holtke; what are you doing?

MR. SMITH:     Trying to terminate the interrogation.

MR. BROWN:     Do you ask specific questions?

MR. SMITH:     Yes, sir.

MR. BROWN:     Do you remember what they are?

MR. SMITH:     Yes, sir.

MR. BROWN:     What were they?

MR. SMITH:     I asked was I charged with something.  I asked did I have a warrant and I say why are you talking to me?

MR. BROWN:     Did they continue talking to you?

MR. SMITH:     Yes, sir.

(XI R.R. at 179-80).  Mr. Smith did everything he knew to do to terminate the interview, not having a clear knowledge of the law, and not having a full understanding of his rights, despite the cursory rattling off of his Miranda rights by

-16-

Sgt. Holtke. He did not want to talk to the detectives, and attempted to terminate the interview the only ways he knew how-by asking if he could have an attorney, and then, when he was told in his understanding that he could not, attempting to end the interview by emulating what his attorney said during his first interview to achieve the same end. Despite Mr. Smith's clear desire to end the interview, the detectives continued to question Mr. Smith, and elicited a statement from him (XI R.R. at 180).

In that statement, Mr. Smith claimed to have been present for the robbery, but left the moment Turk appeared to become aggressively violent with the victim, and had no part in tying up, beating, or killing Mr. Veazie, indicating Mr. Smith's repudiation of Turk's actions (State's Exhibit 101: Defendant's Statement of 12/3/09, at 30:47). At trial, Mr. Smith testified under oath that the only reason he gave this statement to the detectives-which was the only occasion on which he deviated from his insistence that he was not involved in the offense-was in an attempt to protect Junior, whom he viewed as a surrogate brother, from prosecution:

> MR. BROWN: Did you lie to the police when you were in custody in the Harris County Jail 6 or 7 months later in December when Holtke and Clegg came to talk to you?
>
> MR. SMITH: Yes, sir I did.

MR. BROWN:      Were you there and present when everybody got ready to go hit a lick?

MR. SMITH:      No, sir, I wasn't present.

MR. BROWN:      Did you go out behind this washateria and game room and attack Mr. Veazie?

MR. SMITH:      No, sir I didn't.

MR. BROWN:      Did you even leave the scene before Junior and Turk?

MR. SMITH:      No, sir I never was there.

MR. BROWN:      Did you have a Glock 40 or whatever it is?

MR. SMITH:      No, sir.

MR. BROWN:      On your person on that day?

MR. SMITH:      No, sir.

MR. BROWN:      Have you ever shot anybody?

MR. SMITH:      No, sir.

MR. BROWN:      Who were you trying to protect?

MR. SMITH:      Junior.

MR. BROWN:      Explain to the Ladies and Gentlemen of the Jury why you're lying.

MR. SMITH: Junior was my little brother friend and I was trying to explain 'cause he looked up to me. I took advantage of that, you know. I took advantage of him looking up to me as a big brother 'cause he ain't have nobody down here. He from a whole other country, so-

* * *

MR. BROWN: Why would you lie?

MR. SMITH: The reason that I lie was-know what I'm saying you know I felt obligated to protecting Junior after he told me what he went and did with Turk and I promised him that I be his-you know his-basically his alibi for you know what happened.

(XII R.R. at 185-86, 189). Shortly after his second interrogation by police, on January 13, 2010, Mr. Smith was charged with the murder of Curtis Veazie and was formally indicted by the Grand Jury on February 22, 2010 (I C.R. at 10, 15). He was granted appointed counsel and was initially represented by Mr. Joseph Salhab (I C.R. at 11). Mr. Salhab represented Mr. Veazie from January 15, 2010 until the day trial was initially scheduled to start, on July 27, 2012 (I C.R. at 11, 239; VI R.R. at 24). On December 15, 2010, Mr. Salhab filed his Motion to Suppress Statements of the Defendant, which he later followed up with a Memorandum of Law Supporting Smith's Motion to Suppress Evidence and a Supplemental Memorandum of Law

Supporting Smith's Motion to Suppress Evidence on September 7 and 16, 2011, respectively (I C.R. at 63-67, 81-86, 87-91). A hearing was held on Mr. Smith's Motion to Suppress Statements of the Defendant on September 7, 2011, and was continued on October 6, 2011 (II R.R. at 4-72; III R.R. at 3-22). On November 21, 2011, Judge Mark Kent Ellis denied the motion and issues his Findings of Fact and Conclusions of Law relating to the suppression hearing (IV R.R. at 4; I C.R. at 95-98).

**Argument**

> The warnings under *Miranda* and 38.22 specifically state that if a defendant is in custody "he has the right to have a lawyer present to advise him prior to and during any questioning" and "if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning." Mr. Smith was advised of his rights and when he questioned whether he had a lawyer, he was told no. Did the Court of Appeals err in holding that the rights afforded under TEX. CODE CRIM. PROC. ART. 38.22 and 1.051 (i) are not to be weighed against an "ambiguous" response?

In denying the issue regarding the second, in custody statement, the Court of Appeals explained:

> Appellant points out that he asked at the beginning of the December interview, "I got a lawyer?" He argues this question was a sufficiently unambiguous invocation of his right to counsel that the detectives should have stopped the interview until he had had an opportunity to speak with an attorney. But not every mention of a lawyer by a suspect will suffice to invoke the Fifth Amendment right to the presence of counsel during questioning. *Gobert*, 275 S.W.3d at 892. An ambiguous or equivocal statement with respect to counsel does not even require officers to seek clarification, much less halt their interrogation. Id. Whether the mention of a lawyer constitutes a clear invocation of the

right to counsel will depend upon the statement itself and the totality of the circumstances. *Id.* The test is an objective one and the suspect must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. *Id.* at 892–93.

*Smith*, 2015 WL 3751776, at *13. The Court of Appeals failed to fully consider the exchange between Mr. Smith and the interrogating officers:

> MR. SMITH:        I got a lawyer?
>
> SGT. HOLTKE:    Nope.   You're in custody-you're in custody for something completely unrelated to what I want to talk to you about, but since you're in custody, I have to lead-read you your legal warnings.

(State's Exhibit 101: Defendant's Statement of 12/3/09, at 01:05).

Mr. Smith was read his rights which included the right to a lawyer and the right to have one prior to and during questioning. TEX. CODE CRIM. PROC. ART. 38.22 SEC. 2 (A)(3),(4). Mr. Smith was also entitled to an attorney despite not yet being charged with capital murder:

Under 1.051 (i), Mr. Smith was entitled to counsel despite not being charged with a crime:

> Except as otherwise provided by this subsection, if an indigent defendant is entitled to and requests appointed counsel and if adversarial judicial proceedings have not been initiated against the defendant, a court or the courts' designee authorized under Article 26.04 to appoint counsel for indigent defendants in the county shall appoint counsel immediately following the expiration of three working days after the date on which the court or the courts' designee receives the defendant's request for appointment of counsel.

-21-

TEX. CODE CRIM. PROC. ART 1.051 (i).

This Court has explained the protections under the Fifth Amendment:

> Under *Edwards v. Arizona*, once a person invokes his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by merely showing that the suspect responded to police-initiated interrogation after being advised of his rights again. The purpose of the *Edwards* rule is to "prevent police from badgering a defendant into waiving his previously asserted Miranda rights." That prophylactic rule protects the suspect—who has made the decision not to speak to law-enforcement officers without his lawyer and clearly communicated that decision to the police—from further police badgering.

*Pecina v. State*, 361 S.W.3d 68, 76 (Tex. Crim. App. 2012).

Once Mr. Smith questioned whether he had a lawyer, all questioning needed to stop. As the Supreme Court has resolutely held: "We reconfirm these views and, to lend them substance, emphasize that it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." *Edwards v. Arizona*, 451 U.S. 477, 485 (1981).

The right to counsel is considered invoked when the accused indicates that he wants to speak to an attorney or have an attorney present during questioning. *Lucas v. State*, 791 S.W.2d 35, 45 (Tex. Crim. App.1989). The request must "clear and unambiguous." *Dinkins v. State*, 894 S.W.2d 330, 351 (Tex. Crim. App.1995). Clearly, by telling Mr. Smith he wasn't entitled to an attorney (despite *just* having been told he was entitled to counsel) he wanted an attorney.

The semantics and gymnastics utilized by courts to determine there was not invocation of counsel aside - Mr. Smith asked if he had a lawyer and he was told no. This Court should grant review to enforce the strictures of *Miranda* and the Code of Criminal Procedure.

PRAYER FOR RELIEF

For the reasons states above, Mr. Smith prays that this Court grant his petition for discretionary review.

Respectfully submitted,
**ALEXANDER BUNIN**
Chief Public Defender
Harris County Texas

*Jani Maselli Wood*

_____

JANI J. MASELLI WOOD
Assistant Public Defender
Harris County, Texas
Jani.Maselli@pdo.hctx.net
TBN. 00791195
1201 Franklin Street, 13th Floor
Houston, Texas 77002
Phone: (713) 368-0016
Fax: (713) 368-9278

Attorney for Appellant
Carl Lee Smith

CERTIFICATE OF SERVICE

Pursuant to Tex. R. App. Proc. 9.5, this certifies that on August 5, 2015, a copy

of the foregoing was emailed to Lisa McMinn, State Prosecuting Attorney, and the

Harris County District Attorney's Office through texfile.com at the following address:


Eric Kugler
Assistant District Attorney
1201 Franklin Street, 6th Floor
Houston, TX 77002
kugler_eric@dao.hctx.net

Lisa McMinn
Lisa.McMinn@SPA.texas.gov

*Jani Maselli Wood*

_____

JANI J. MASELLI WOOD

CERTIFICATE OF COMPLIANCE

Pursuant to proposed Rule 9.4(i)(3), undersigned counsel certifies that this petition complies with the type-volume limitations of TEX. R. APP. PROC. 9.4(I)(2)(D).

1.      Exclusive of the portions exempted by TEX. R. APP. PROC. 9.4 (I)(1), this petition contains 4000 words printed in a proportionally spaced typeface.

2.      This petition is printed in a proportionally spaced, serif typeface using Garamond 14 point font in text and Garamond 14 point font in footnotes produced by Corel WordPerfect software.

3.      Undersigned counsel understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in *Tex. R. App. Proc. 9.4(j)*, may result in the Court's striking this brief and imposing sanctions against the person who signed it.

*Jani Maselli Wood*

_____

JANI J. MASELLI WOOD

2015 WL 3751776
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND
SIGNING OF OPINIONS.

DO NOT PUBLISH—TEX. R. APP. P. 47.2(B).

Court of Appeals of Texas,
Houston (14th Dist.

Carl Lee Smith, Appellant
v.
The State of Texas, Appellee
NO. 14–13–00595–CR | Memorandum Opinion filed
June 16, 2015

On Appeal from the 351st District Court, Harris County,
Texas, Trial Court Cause No. 1247979

Attorneys and Law Firms

Jani J. Maselli Wood, for Carl Lee Smith.

Eric Kugler, for the State of Texas.
Panel consists of Chief Justice Frost and Justices Christopher
and Busby.

MEMORANDUM OPINION

J. Brett Busby, Justice

*1 Appellant Carl Lee Smith was convicted of the capital murder of the complainant Curtis Veazie and sentenced to imprisonment for life without the possibility of parole. Appellant appeals his conviction, raising four issues. Appellant contends in his first issue that the trial court abused its discretion when it admitted photographs of the death scene and autopsy over his objection based on Rule 403 of the Texas Rules of Evidence. We conclude that even if the trial court abused its discretion when it admitted the challenged photographs, appellant was not harmed by their admission.

In his second issue, appellant asserts the trial court erred when it denied his motion for directed verdict because there is legally insufficient evidence placing him at the scene of the crime. Because appellant's statements, which were admitted into evidence, place appellant at the scene of the crime as part of a conspiracy to rob Veazie, we hold the evidence is legally sufficient to support appellant's conviction and therefore the trial court did not err when it denied his motion for directed verdict. Appellant next argues that the trial court abused its discretion when it admitted into evidence audio statements appellant made to the police in January and December 2009 because (1) the January statements were made while appellant was in custody and without *Miranda* warnings;[1] and (2) the police denied appellant his right to counsel under both the Fifth and Sixth Amendments. We overrule this issue because appellant was not in custody at the time of the January 2009 statements, both the January and December statements were voluntary, and appellant was not deprived of his right to counsel during any of his statements.

Finally, appellant contends the evidence is legally insufficient to support the amount of court costs assessed against him because there is no bill of costs in the record. We overrule this issue because the bill of costs for the exact amount of the costs assessed against appellant found in the record provides an adequate basis for the assessment of court costs against appellant. We therefore affirm the judgment.

Background

A. The complainant's murder
Whitney Shaw, one of the principal witnesses at trial, provided testimony regarding appellant's conduct before the murder. In January 2009, Whitney lived in the Hunter Wood apartment complex along with her mother, Cheryl Shaw. The complex is in eastern Harris County near the Pine Trails neighborhood. Whitney was dating Darius Bogar. Darius was one of several young men Whitney saw hanging around the Hunter Wood apartments during that time period. These young men included Silvanus "Lo" Rene and Cedrick "Turk" Robinson. Whitney also saw appellant, known as Piper, around the Hunter Wood apartments a few times. Lo had two different apartments in the Hunter Wood complex and Whitney, along with many other people, would hang out in them.

On the evening of January 4, 2009, Whitney went to Lo's apartment to visit Darius. Darius was not there when Whitney arrived, so she decided to wait for him. While she was waiting, Whitney saw appellant, Turk, and a male she knew as Junior, putting on dark clothing and getting guns out of a closet. Whitney testified that she thought they were getting ready to "go hit a lick" or getting ready "to go rob somebody." Whitney testified she saw two guns, one several feet long and the other about a foot long. According to Whitney, the first gun resembled a photograph of an AK–47 that she was shown during her trial testimony. The three men left the apartment around 10:00 p.m. or 11:00 p.m.

*2 In January 2009, complainant Curtis Veazie lived in the Pine Trails neighborhood in eastern Harris County. Veazie and his wife were having problems at that time, and as a result

Veazie had moved out. Veazie then stayed with his friend Kenneth Jones in nearby Channelview for a few days.

Veazie worked two jobs and he liked to gamble during his spare time. Reynaldo Garza testified that Veazie was a regular customer at the eastside game room where Garza worked. The game room was located in a strip center on Wallisville Road near the intersection with Uvalde. Garza testified that he saw Veazie, alone, at the game room between 10:00 and 11:30 on the evening of January 4. Garza testified that Veazie always drove an older, white, four-door car.

Garza testified that he left the game room for a while that evening but he returned to close the game room at about 1:00 a.m. Garza testified that he was escorting Irma Escobedo, another employee, to her car when he thought he heard firecrackers. Escobedo said they were not firecrackers but gunshots. Garza testified that he heard two shots and he thought they came from behind the strip center. Escobedo got in her car and began to drive toward the exit from the strip center parking lot. Garza testified that he saw a white car drive out from behind the strip center, pass in front of Escobedo's car, and then turn onto Wallisville Road. The next morning, Garza realized that the white car he had seen driving out from behind the strip center was Veazie's. A surveillance camera at an auto repair business across the street from the strip center captured the two cars leaving the strip center parking lot at approximately 1:40 a.m. on January 5.

That same morning, Sergeant Michael Holtke, a Harris County Sheriff's Department homicide detective, was dispatched to the strip center in response to a 9–1–1 call reporting a dead body. Holtke was the lead detective investigating the murder. The manager of a washateria in the same strip center as the game room had called 9–1–1 after an elderly lady searching for cans had discovered a dead body. Veazie's body was lying in the alley behind the strip center. There was a gunshot entrance wound in Veazie's left forehead, and stippling around the wound indicated that the bullet had been fired from a relatively short distance. The bullet created an exit wound in front of Veazie's right ear. When investigators rolled Veazie's body over, they recovered a bullet along with a sock from under Veazie's face. Investigators also found a spent 7.62 x 39mm rifle cartridge casing on the ground. Deputy Bradley Bruns, a firearms expert with the Harris County Sheriff's Department, testified the cartridge had been fired from an AK–47 assault rifle.

The autopsy revealed that Veazie had also suffered multiple blunt-force trauma to his head. As a result of repeated blows from an unidentified blunt instrument, Veazie's left eyeball was partially out of its socket and his right eyeball was completely out of its socket. There was massive damage to Veazie's head and a lot of blood around his body. An investigator who processed the crime scene testified that the lack of blood on most of Veazie's clothes indicated he was lying face down on the concrete paving when he was shot. Shoelaces had been used to bind Veazie's ankles and wrists. Investigators also discovered additional shoelaces around his mouth area. Blood spatter had been sprayed on a nearby wall from an impact that occurred near ground level. The forensic pathologist who conducted the autopsy testified that Veazie's death was consistent with more than one assailant.

*3 While the homicide investigators were still at the scene of the murder, other officers discovered Veazie's car abandoned in a utility right of way near the Pine Trails neighborhood. The police found Veazie's wallet on the passenger side of the vehicle. They also found clothes and a pair of sneakers without shoelaces in the car's trunk.

B. The investigation
Cheryl Shaw, Whitney's mother, ran a small store out of her apartment in the Hunter Wood apartments. As a result of that activity, and the fact Whitney was still in high school in 2009, Cheryl was familiar with many of the people who lived in or hung out at the Hunter Wood apartments. Cheryl testified that she knew Darius and Turk because they went to high school with Whitney. Cheryl was also familiar with Lo. Cheryl testified that around the time of the murder, she saw appellant with Turk and another young man she knew only as Junior. Cheryl went on to testify that she always saw appellant with Turk and Junior. At a point in time after Veazie's murder, Turk was standing outside the Shaw apartment when Cheryl noticed blood on his shoes. After seeing a news report about Veazie's death and an invitation to call Crime Stoppers with any information about the murder, Cheryl called Crime Stoppers.

A large number of Sheriff's Department officers came to the Hunter Wood apartments. The officers went door to door looking for people in the apartment complex and they eventually came upon Cheryl, who was outside with her dog. Cheryl was reluctant to talk to the officers because all of the people in the complex were outside as a result of the officers' activity. Cheryl suggested the officers act as if they were arresting her so she would have an opportunity to talk to them without it looking suspicious to her neighbors. In response to Cheryl's suggestion, the officers put her in handcuffs and placed her in the back of a police car, where she talked to the officer. While Cheryl was in the back of the police car, the

officers cleared out one of Lo's apartments, and she identified one of the people who came out of the apartment as Turk. Cheryl later traveled to a nearby Sheriff's Department substation where she gave a statement to detectives investigating Veazie's murder.

Sergeant Holtke and the other detectives investigating Veazie's death had learned information about the murder from people in the area that had caused them to go to the Hunter Wood apartments on January 8, 2009. Prior to that point in time, Holtke had not yet heard of appellant, Turk, or Junior. Once at the Hunter Wood apartments, the officers learned about apartment units that were occupied by several men. The officers also heard the names Turk and Lo. The officers proceeded to clear out what should have been vacant apartments and Turk was one of the people they cleared out. He was arrested for capital murder that day. Holtke then interviewed Turk on two different occasions. At that point, Holtke was looking into a second suspect, known only as Piper. During the interview with Cheryl at the Sheriffs Department substation, Cheryl identified Turk in a photospread and tentatively identified appellant as Piper from one out of a selection of seventeen photographs of people named Carl Smith.

C. Appellant's interviews

Having secured an identification of Piper as appellant, Holtke was able to learn appellant had a court appearance scheduled on another criminal matter on January 14. Holtke and a second detective went to the courthouse and asked a bailiff to talk to appellant and bring him back to a jury room where they could speak with him. The bailiff brought appellant into the jury room where the two detectives were waiting. Appellant would participate in three recorded interviews that day.

*4 At the beginning of the first interview, the detectives greeted appellant and told him "you know you are not in custody or anything." The detectives then said they wanted to talk to appellant about an event they were investigating. The detectives then showed appellant a Crime Stoppers flyer relating to Veazie's murder as well as a photo of Veazie's abandoned car. Appellant initially denied having seen either Veazie or the car before. The conversation continued until about six minutes into the interview, when appellant said: "I need, I need a lawyer, sir. Can I, can I call my lawyer in here?" The following dialogue then occurred:

Detective 1: "Course you can."

Appellant: "Cause I really ... know what I'm sayin'?"

Detective 1: "Course you can."

Appellant: "I really-I-I know what's up. You know what I'm sayin'?"

Detective 1: "You do know what's up with this?"

Appellant: "Yes, sir, you know what I'm sayin', but only thing is, you know what I'm sayin', they you know ..."

Detective 1: "If you, Dude, if you were there ..."

Appellant: "These people ..."

Detective 2: "Hey, hey, hey ..."

Appellant: "These people ..."

Detective 1: "Hey ..."

Appellant: "These people that I'm dealin' with ..."

Detective 2: "Carl, Carl, Carl."

Detective 1: "Let him finish, he, he, he's talking."

Detective 2: "Okay."

Appellant: "These people man, you know what I'm sayin', I'm scared of these people, man, you know what I'm sayin'?"

Detective 1: "Okay."

Appellant: "They, they, they vicious people man, you know what I'm sayin? They don't play no games, man."

Appellant continued talking with the detectives and explained that the people he was talking about were gang-related and if he told the police what had happened, he did not want his name connected with it. With that introduction, appellant told the detectives that he was visiting his "partner" Lo at the Hunter Wood apartments when Turk came in the apartment saying he had just killed somebody.

Less than a minute later, which was about nine minutes into the interview, the following exchange occurred:

> Appellant: "Well, know, 'fore I say anything further man, you know what I'm sayin', I really want to get my lawyer up in here."

> Detective 1: "Well, get him."

> Appellant: "So I can understand what's going on."

> Detective 1: "I mean, you know, that's ..."

> Detective 2: "Well, here, okay, then that's fine, but here's what I'm not understanding. I'm trying to follow what you're saying here. You're saying you were just told about this?"

> Appellant: "Yeah, Turk just came and, you know, we was out and high when he came and told us."

Appellant went on to explain that Turk then showed them where he had left the murdered man's car. Appellant told the detectives it was the car in the photo they had shown him at the beginning of the interview. At this point, appellant admitted that he touched the car when he, and numerous others, went with Turk to look at the car. Appellant denied that he got inside the car, however. When asked who else had gone with Turk to see the car, appellant admitted that Junior, his "little partner," had gone with him. Appellant denied that Junior had anything to do with the murder. Appellant also denied knowing Junior's real name.

Appellant told the detectives that he and the other people who had followed Turk to the car were upset with Turk for bringing the car to the vicinity of the Hunter Wood

apartments because it would bring the police into the area to investigate. Sergeant Holtke then told appellant: "you're not in handcuffs; we're not taking you anywhere," but they needed appellant to tell them everything Turk had told him about the murder. Appellant responded that Turk told him that Turk had tied Veazie up so he would not run away, and that Turk had killed Veazie because he would not stop screaming and making noise. Appellant said he did not know why Turk picked Veazie because "the dude didn't get nothing. He ain't got no rims on his car. He ain't got nothing. I don't see nothing he could get out of him, this man old. I don't know, man, probably thought the man had a grip on him or something. Know what I'm saying?"[2]

*5 The interview continued and appellant told the detectives that in the organization he is part of, "you don't snitch on people." He went on to explain that he believed in telling the truth. Appellant then changed his story, eventually telling the detectives that he did not know what Turk was going to do that night. He explained that he and Junior were not with Turk at first. Turk told them he was going to "go hit a lick." Later, appellant and some other people were in a park by Pine Trails when they heard gunshots and then Turk drove up in a car. Appellant got into the passenger seat. Turk continued to drive, but the car did not run well, so they parked it in the spot where the police eventually found it. They then walked to the Hunter Wood apartments. Once back at the apartments, Turk informed them that he had shot a man a short time before. At that point, about ten to twelve people walked back to the car and tried to wipe their fingerprints off the car.

At this point in the interview, someone entered the jury room and said the attorney is here. Appellant's attorney on another criminal matter then entered the jury room and introduced himself. The attorney invoked appellant's right to silence and asked if they could take a break so he could speak with appellant. The attorney went on to say that they could reconvene after the break and appellant could decide if he wanted to continue talking with the detectives. The first interview ended at that point, and the detectives left the room.

After appellant had an opportunity to speak with his attorney, the detectives re-entered the room. Holtke resumed recording and said that appellant's attorney had told them that appellant wanted to continue talking with them. During this second interview, which lasted approximately ten minutes, appellant explained that he was in a park behind the Pine Trails neighborhood with some females when he heard gunshots. Appellant saw a car drive up. Turk was driving and he told appellant and Junior to get in the car. They then drove toward the Hunter Wood apartments and Turk parked the car where

it was later found by the police. The three of them then walked along a trail in some woods toward the apartments, and Turk pulled off his pants and attempted to burn them. Turk told them that he had blood on the pants. When they got to the apartment, Turk told them he had murdered somebody. Turk then told them he had tied the man up and shot him with an AEC–47 because the man would not be quiet. Lo and others, who were prominent in a gang, told everyone to be quiet about what they had heard, and then made threats as to what would happen if they were not. The interview concluded with the detectives asking appellant if he would be willing to meet with them later to look at photos to identify the people he had discussed during the interview. Appellant was not arrested and he left the jury room on his own.

The third interview on January 14 started about one hour after the conclusion of the second. Sergeant Holtke parked outside the courthouse and appellant came out and got into Holtke's vehicle. Appellant identified Turk in a photo spread and told Holtke the person he identified was the same person who had shot Veazie. Appellant identified Lo in a second photo spread. The interview ended when appellant got out of Holtke's vehicle, less than seven minutes after he had gotten in.

Sergeant Holtke and his partner, Sergeant Eric Clegg, interviewed appellant again on December 3, 2009. Appellant had been convicted on another criminal charge and was incarcerated at the Baker Street Jail awaiting transportation to a state jail facility when he was interviewed. Holtke read appellant his *Miranda* warnings and asked if he understood them. Appellant responded by asking if he was being charged with something. Holtke answered no. Appellant asked if he had a lawyer and Holtke again answered no. Appellant then asked if there was a warrant, and Holtke again answered no. Holtke then explained that because appellant was in custody on an unrelated matter, he had to read him his legal warnings. Appellant then asked why they were talking to him. Holtke responded: "well, I'll explain that to you when you want to talk to me." Appellant responded "alright" and Holtke proceeded to ask appellant questions.

*6 During the course of the interview, appellant admitted that he, Turk, and Junior "geared up" that night to "make some bread." Appellant said that each was armed but Turk carried an AK–47. The three of them then walked over to the strip center on Wallisville Road and Turk went behind the center to use the bathroom. Turk came out and said there was a man asleep behind the building. They walked behind the building and Turk woke the man up and got him out of his car. They took Veazie's wallet and there was nothing in it. Appellant

asked "where the bread at?" Turk then hit Veazie in the face and asked "where the bread at?" Appellant said he told Turk "look dog[,] look bro [,] that man ain't got no money, know what I'm talking about.... Man got clothes ... in his car...." Appellant then told the detectives that Turk said that Veazie "had seen his face." Thinking Turk was going to kill the man, appellant told the detectives he walked out from behind the strip center and then down Wallisville Road toward the Hunter Wood apartments. According to appellant, Junior initially stayed with Turk but he came walking up about five minutes later saying Turk was going to murder that man. Soon thereafter, Turk drove up in the man's car, picked the two of them up, and then drove the car to the spot where it was found by the police.

D. Appellant's trial

Appellant was charged with capital murder. He filed a pre-trial motion to suppress that sought to exclude all four of his statements. The trial court denied the motion and filed findings of fact and conclusions of law. The case proceeded to trial, and the State sought to admit into evidence numerous photographs of the crime scene and Veazie's body. Appellant objected to the admission of State's Exhibits 8 and 9 as cumulative. Appellant also objected to State's Exhibits 51, 52, 53, 55, 56, 57, 59, and 60 as cumulative and prejudicial under Rule 403 of the Texas Rules of Evidence. The trial court overruled the objections and admitted the photographs into evidence. At the conclusion of the evidence, the jury found appellant guilty of capital murder and the trial court imposed the mandatory sentence of life in prison without the possibility of parole. This appeal followed.

Analysis

As mentioned above, appellant raises four issues on appeal. We address appellant's second issue first because it challenges the trial court's denial of his motion for directed verdict and seeks rendition of a judgment of acquittal.

I. The evidence is sufficient to support appellant's capital murder conviction because his own statements place him at the scene of the murder as a member of a conspiracy to commit robbery.

In his second issue, appellant contends the trial court should have granted his motion for directed verdict because the evidence is insufficient to support his capital murder conviction.

A. Standard of review and applicable law

A challenge to the denial of a motion for directed verdict is a challenge to the legal sufficiency of the evidence. *Gabriel v. State,* 290 S.W.3d 426, 435 (Tex.App.–Houston [14th Dist.] 2009, no pet.). When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether a rational jury could have found the elements of the offense beyond a reasonable doubt. *Gear v. State,* 340 S.W.3d 743, 746 (Tex.Crim.App.2011) (citing *Jackson v. Virginia,* 443 U.S. 307, 318–19 (1979)). In conducting this review, an appellate court considers all evidence in the record, whether it was admissible or inadmissible. *Winfrey v. State,* 393 S.W.3d 763, 767 (Tex.Crim.App.2013) (citing *Dewberry v. State,* 4 S.W.3d 735, 740 (Tex.Crim.App.1999)).

We may not substitute our judgment for that of the jury by reevaluating the weight and credibility of the evidence. *Romero v. State,* 406 S.W.3d 695, 697 (Tex.App.–Houston [14th Dist.] 2013, rev'd on other grounds by *Romero v. State,* 427 S.W.3d 398, 399 (Tex.Crim.App.2014)(per curiam)). We defer to the jury's responsibility to resolve any conflicts in the evidence fairly, weigh the evidence, and draw reasonable inferences. *Id.* The jury alone decides whether to believe eyewitness testimony, and it resolves any conflicts in the evidence. *Id.* The jury may choose to believe some testimony and disbelieve other testimony. *Wyatt v. State,* 23 S.W.3d 18, 30 (Tex.Crim.App.2000). In addition, because it is the sole judge of the weight and credibility of the evidence, the jury may find guilt without physical evidence linking the accused to the crime. *Romero,* 406 S.W.3d at 697. In conducting a sufficiency review, we do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure the jury reached a rational decision. *Young v. State,* 358 S.W.3d 790, 801 (Tex.App.–Houston [14th Dist.] 2012, pet. ref'd).

*7 A person commits capital murder if he intentionally causes the death of an individual in the course of committing or attempting to commit robbery. Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(2) (West 2011). A person commits robbery if, in the course of committing theft and with the intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. Tex. Penal Code Ann. § 29.02(a)(1)-(2) (West 2011). Theft is the unlawful appropriation of property with the intent to deprive the owner of the property. Tex. Penal Code Ann. § 31.03 (West 2011). Appropriation of property is unlawful if it is without the owner's effective consent. *Id.* § 31.03(b)(1).

A person may be guilty as a party to capital murder if the defendant committed the offense by his own conduct or by the conduct of another for which he is criminally responsible. Tex. Penal Code Ann. § 7.01(a) (West 2011); *see Gross v. State,* 380 S.W.3d 181, 186 (Tex.Crim.App.2012). "If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy." Tex. Penal Code Ann. § 7.02(b) (West 2011). A defendant in a capital murder case may be convicted solely on a conspiracy theory of culpability contained in the jury charge. *Love v. State,* 199 S.W.3d 447, 452 (Tex.App.–Houston [1st Dist.] 2006, pet. ref'd) (citing *Fuller v. State,* 827 S.W.2d 919, 932–33 (Tex.Crim.App.1992)). Therefore, the State is not required to present evidence of a defendant's intent to kill as long as the evidence establishes that a felony was committed as a result of a conspiracy and the murder should have been anticipated in carrying out the conspiracy to commit the underlying felony. *Ruiz v. State,* 579 S. W.2d 206, 209 (Tex.Crim.App. [Panel Op.] 1979).

Proof of a culpable mental state invariably depends on circumstantial evidence. *See Heckert v. State,* 612 S.W.2d 549, 550 (Tex.Crim.App. [Panel Op.] 1981); *Martin v. State,* 246 S.W.3d 246, 263 (Tex.App.–Houston [14th Dist.] 2007, no pet.). A culpable mental state can be inferred from the acts, words, and conduct of the accused. *Martin,* 246 S.W.3d at 263.

We may look to events before, during, and after the commission of the offense to determine whether there is sufficient evidence that an individual is a party to an offense. *Gross,* 380 S.W.3d at 186. We may also consider circumstantial evidence. *Id.* "There must be sufficient evidence of an understanding and common design to commit the offense." *Id.* It is unnecessary that each fact point directly to the guilt of the defendant so long as the cumulative effect of the facts is sufficient to support the conviction under the law of parties. *Id.* "However, mere presence of a person at the scene of a crime, or even flight from the scene, without more, is insufficient to support a conviction as a party to the offense." *Id.*

B. Sufficient evidence supports appellant's capital murder conviction.

A person may be charged with an offense as a principal, a direct party, or a co-conspirator. *See* Tex. Penal Code §§ 7.01 (person is "criminally responsible" if offense is committed by his own conduct or by the "conduct of another for which he is criminally responsible"); 7.02(a)(2) (describing criminal responsibility for direct party); 7.02(b) (describing criminal responsibility for party as co-conspirator). Because the evidence offered at trial indicates that Turk shot Veazie, we consider whether the evidence supports appellant's conviction as a coconspirator. As explained below, we conclude the evidence is sufficient to support appellant's conviction as a co-conspirator under section 7.02(b) because the evidence supports a finding that appellant should have anticipated the possibility of a murder resulting from the course of committing robbery.

*8 Appellant is guilty of capital murder under section 7.02(b) if (1) he was part of a conspiracy to rob Veazie; (2) one of the conspirators murdered Veazie; (3) the murder was in furtherance of the conspiracy; and (4) the murder should have been anticipated as a result of carrying out the conspiracy. *Hooper v. State,* 214 S.W.3d 9, 14 n.4 (Tex.Crim.App.2007). Appellant argues there is no evidence linking him to Veazie's murder or establishing that he had an understanding and common design to commit murder that night. In making this argument, appellant asserts we must disregard his December 3, 2009 statement because he recanted it during his trial testimony. Appellant also contends that Whitney Shaw's testimony about appellant gearing up with Turk and Junior to go rob people must be discounted because other witnesses testified that appellant was present at a family party in a different part of Harris County the night of Veazie's murder.

We disagree that the evidence, when viewed under the appropriate standard of review, is insufficient to support appellant's capital murder conviction. First, when reviewing sufficiency claims, an appellate court must consider all of the evidence presented, whether properly or improperly admitted. *Ervin v. State,* 333 S.W.3d 187, 200 (Tex.App.–Houston [1st Dist.] 2010, pet. ref'd) (citing *Fuller,* 827 S.W.2d at 931). We therefore consider both appellant's December 3, 2009 statement as well as Whitney Shaw's testimony. Appellant's decision to recant his statements during his trial testimony and to present several alibi witnesses on his whereabouts on the night of the murder meant that it was up to the jury, as the exclusive judge of the credibility of the witnesses and the weight to be given their testimony, to resolve any conflicts and inconsistencies in the evidence and render its verdict. The jury's choice to resolve those conflicts and inconsistencies in favor of the State does not render the evidence insufficient. *See Chambers v. State,* 805 S.W.2d 459, 461 (Tex.Crim.App.1991) (stating the jury can disbelieve a

witness's recantation of her prior testimony); *Johnson v. State,* 421 S.W.3d 893, 898 (Tex.App.–Houston [14th Dist.] 2014, no pet.) ("Appellant's own statement that he did not conspire to rob Vasquez does not render the evidence to the contrary insufficient."); *see also Cole v. State,* 194 S.W.3d 538, 551 (Tex.App.–Houston [1st Dist.] 2006, pet. ref'd) (holding jury is entitled to believe any or all of testimony of the State's witnesses and fact it resolved conflicts in the evidence in favor of the State did not render evidence factually insufficient).

Appellant also is incorrect when he argues there must be evidence that he had an understanding and common design to commit murder. Instead, all that the State was required to prove beyond a reasonable doubt was that appellant was part of a conspiracy to commit another felony—here, robbery.*See Ruiz,* 579 S.W.2d at 209.

We conclude there is sufficient evidence in the record supporting appellant's capital murder conviction. This evidence includes Whitney Shaw's testimony that appellant "geared up" along with Turk and Junior to go out and rob people to make some money the night of Veazie's murder, indicating a prior plan to commit the robbery in which appellant participated. Although Shaw saw only two guns that night, appellant admitted during his statement that all three were armed. Appellant also admitted during his statement that he knew Turk was crazy, was a "super-gangster," was "wired up" on drugs the night of the murder, and was capable of committing violent acts. *See Johnson,* 421 S.W.3d at 898–99 (explaining that reason to believe co-conspirator was violent and awareness that co-conspirators were armed can show that defendant should have anticipated murder occurring in course of robbery).

Appellant's statement also ties him directly to the robbery. Appellant told police during his December statement that he and the other two armed men left the Hunter Wood apartments and eventually walked behind a nearby strip center where they found Veazie asleep in his car. Appellant also told the police that they removed Veazie from his car and that he himself asked, at least one time, where the "bread" was located. Evidence also showed that Veazie was tied up, an action the jury could reasonably infer would require more than one person to perform. Appellant also admitted during his December 3, 2009 statement that he saw Turk beat Veazie. There was also evidence that Veazie was gagged and ultimately shot because he would not stop screaming. Although appellant told police during his statement that he walked away from the scene before Veazie was shot, the jury, as the trier of fact, was entitled to disbelieve that part of his

statement even if it accepted the remainder. *See Chambers, 805 S.W.2d at 461* (stating the jury, as the trier of fact, is entitled to judge the credibility of witnesses and can believe some, all, or none of the testimony presented by the parties).

*9 The evidence also showed that Veazie's assailants took his car and drove it a short distance away from the scene of the crime. Finally, appellant told the police during his statements that he, along with a group of about ten to twelve other people, went back to the car to wipe it down and thereby remove any evidence indicating that he had touched the vehicle. We conclude that this evidence of events before, during, and after Veazie's murder would permit a rational trier of fact to conclude, beyond a reasonable doubt, that appellant was part of a conspiracy to rob Veazie, that appellant was present at the scene of the murder, that the murder was committed by one of the conspirators in furtherance of the conspiracy, and that appellant should reasonably have anticipated the possibility that a murder might occur during the course of that robbery. Accordingly, we overrule appellant's second issue.

## II. Appellant was not harmed by the admission of autopsy and crime scene photographs.

Turning to appellant's arguments for a new trial, appellant asserts in his first issue that the trial court abused its discretion when it admitted ten autopsy and crime scene photographs over his Rule 403 objection.[3] According to appellant, the challenged photographs were needlessly cumulative of other evidence and their probative value was substantially outweighed by the danger of unfair prejudice. Assuming without deciding that the trial court abused its discretion when it overruled his objections and admitted the challenged photographs into evidence, we conclude that appellant was not harmed as a result.

A conviction will not be reversed " 'merely because the jury was exposed to numerous admittedly 'gruesome' pictures.' " *Drew v. State,* 76 S.W.3d 436, 453 (Tex.App.–Houston [14th Dist.] 2002, pet. ref'd) (quoting *Long v. State,* 823 S.W.2d 259, 275 (Tex.Crim.App.1991)). The admission of evidence in violation of an evidentiary rule is non-constitutional error. *Hamilton v. State,* 399 S.W.3d 673, 684 (Tex.App.–Amarillo 2013, pet. ref'd) (citing *Johnson v. State,* 967 S.W.2d 410, 417 (Tex.Crim.App.1998)). The trial court's erroneous admission of photographs is harmless if, after reviewing the entire record, we have fair assurance that the error did not influence the jury or had but a slight effect upon the jury's verdict. *Rolle v. State,* 367 S.W.3d 746, 752 (Tex.App.–Houston [14th Dist.] 2012, pet. ref'd). In making this determination, an appellate court should consider the trial

testimony and other admitted evidence, the jury instructions, the State's theories and any defensive theories, closing arguments, and even voir dire if applicable. *Bagheri v. State,* 119 S.W.3d 755, 763 (Tex.Crim.App.2003). The presence of overwhelming evidence supporting the finding of guilt can also be a factor in the evaluation of harmless error. *Motilla v. State,* 78 S.W.3d 352, 357 (Tex.Crim.App.2002).

As previously discussed, the record contains abundant evidence of appellant's guilt. This evidence includes appellant's December 3, 2009 statement, in which he confessed to every element of capital murder. In addition, the State used the challenged photographs to illustrate the specific mechanics of Veazie's death, which helped to establish that there was more than one assailant. *See Morales v. State,* 32 S.W.3d 862, 867 (Tex.Crim.App.2000) (holding reviewing court should consider State's theory in assessing harm); *Samuels v. State,* 785 S.W.2d 882, 888 (Tex.App.–San Antonio 1990, pet. ref'd) (considering State's purpose for offering autopsy photographs). In addition, the gruesome nature of the photos stems from the extremely brutal nature of the conspirators' own criminal conduct. *See Jones v. State,* 111 S.W.3d 600, 609 (Tex.App.–Dallas 2003, pet. ref'd) (considering the brutal nature of the defendant's criminal conduct in determination that admission of autopsy photographs was not harmful). Finally, the State did not once mention the challenged photographs during its closing argument. *See Reese v. State,* 33 S.W.3d 238, 244 (Tex.Crim.App.2000) (concluding erroneous admission of photographs was harmful in part because State emphasized photographs during closing argument).

*10 We conclude that, in the context of the entire case against appellant, any error the trial court may have made in admitting the challenged photographs did not influence the jury or had but a slight effect and therefore did not affect appellant's substantial rights. *See Drew,* 76 S.W.3d at 453. We overrule appellant's first issue.

## III. The trial court did not abuse its discretion when it denied appellant's motion to suppress his January and December statements.

In his third issue, appellant contends that the trial court abused its discretion when it denied his motion to suppress and admitted into evidence audio recordings of two of his statements to the detectives investigating Veazie's murder. Appellant argues the trial court should have excluded the first statement he made on January 14, 2009 because it resulted from "an un-*Mirandized* custodial interrogation in which he invoked his right to counsel and was denied access to counsel." Appellant also asserts the trial court should have

excluded his December 3, 2009 statement because "it was the result of a *Mirandized* custodial interrogation in which [appellant] invoked his right to counsel and was denied access to counsel." We address each argument in turn.

A. Standard of review

In reviewing a trial court's ruling on a motion to suppress, an appellate court must apply an abuse-of-discretion standard and overturn the trial court's ruling only if it is outside the zone of reasonable disagreement. *Martinez v. State,* 348 S.W.3d 919, 922 (Tex.Crim.App.2011). We must view the evidence in the light most favorable to the trial court's ruling. *Weide v. State,* 214 S.W.3d 17, 24 (Tex.Crim.App.2007). At a suppression hearing, the trial judge is the sole trier of fact and assesses the witnesses' credibility and decides the weight to give to that testimony. *Id.* at 24–25. When, as here, the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the ruling, supports those fact findings. *State v. Kelly,* 204 S.W.3d 808, 818 (Tex.Crim.App.2006). We then review the trial court's legal rulings de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* We uphold the ruling if it is supported by the record and correct under any theory of the law applicable to the case. *Hereford v. State,* 339 S.W.3d 111, 117–18 (Tex.Crim.App.2011).

Generally, we limit the scope of our review to the evidence adduced at the suppression hearing because the ruling was based on it rather than evidence introduced later. *Gutierrez v. State,* 221 S.W.3d 680, 687 (Tex.Crim.App.2007); *Turner v. State,* 252 S.W.3d 571, 577 (Tex.App.–Houston [14th Disk] 2008, pet. ref'd). But, when, as here, the parties re-litigate the suppression issue at trial, we consider all evidence from both the pre-trial suppression hearing and the trial in reviewing the trial court's determination. *See Gutierrez,* 221 S.W.3d at 687; *Turner,* 252 S.W.3d at 577.[4]

B. Because appellant was not in custody during his first January 2009 statement, the trial court did not abuse its discretion when it denied appellant's motion to suppress the statement.

*11 Appellant argues the trial court should have suppressed the audio recording of his initial interview on January 14, 2009 because (1) he was in custody, (2) he invoked his right to counsel during the interview, and (3) the detectives denied him access to his attorney and continued to question him. In support of his contention that he was in custody during the initial interview, appellant points out that he was taken to a jury room by an armed bailiff, the jury room was in a non-public area of the courthouse, he was interviewed by two armed detectives, and other people were denied entry into the room during the interview. Appellant also points to his testimony that he subjectively believed he was under arrest and was not free to leave the jury room.

In *Miranda,* the Supreme Court of the United States held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. Texas codified these safeguards in article 38.22 of the Texas Code of Criminal Procedure. Section 3(a) of article 38.22 provides that no oral statement of an accused "made as a result of custodial interrogation" shall be admissible against him in a criminal proceeding unless an electronic recording of the statement is made, the accused is given all specified warnings, including the *Miranda* warnings, and he knowingly, intelligently, and voluntarily waives the rights set out in the warnings. Tex.Code Crim. Proc. Ann. art. 38.22 § 3(a) (West 2005).

*Miranda* warnings and article 38.22 requirements are mandatory only when there is a custodial interrogation, however. *Herrera v. State,* 241 S.W.3d 520, 526 (Tex.Crim.App.2007). The meaning of "custody" is the same for purposes of both *Miranda* and article 38.22. *Id.* The State has no burden to show compliance with *Miranda* unless and until the record as a whole "clearly establishes" that the defendant's statement was the product of a custodial interrogation. *Id.*

Generally, a person is considered to be in custody for purposes of *Miranda* and article 38.22 when: (1) the person is formally arrested; or (2) the person's freedom of movement is restrained to the degree associated with a formal arrest. *Nguyen v. State,* 292 S.W.3d 671, 677 (Tex.Crim.App.2009). Because it is undisputed that appellant was not formally under arrest during any of his January 2009 statements, the issue here turns on whether a reasonable person would have felt that he was not at liberty to terminate the interview and leave. *Nguyen,* 292 S.W3d at 678; *Dowthitt v. State,* 931 S.W.2d 244, 254 (Tex.Crim.App.1996) (citing *Stansbury v. California,* 511 U.S. 318, 322 (1994)). Our custody inquiry includes an examination of all the objective circumstances surrounding the questioning. *Herrera,* 241 S.W.3d at 525. The subjective belief of law enforcement officers about whether a person is a suspect does not factor into the custody determination unless that officer's subjective belief has been conveyed to the person being questioned. *Id.* at 525–26.

Here, the interview occurred in a jury room in the Harris County criminal courthouse, where appellant had appeared in connection with another criminal matter. Appellant was brought to the jury room by a bailiff and there were two plain-clothes detectives in the room waiting for him. Both detectives were armed, but they did not display their weapons during the interview. The complete interview was recorded and is contained in the appellate record. The detectives explicitly told appellant at the beginning of the interview that he was not in custody. Similarly, one of the detectives reminded appellant later in the interview that appellant was not in handcuffs and the detectives were not going to take him anywhere. In addition, when appellant asked if he could call the lawyer representing him in the other criminal matter into the room, the detectives told him that he could. Shortly thereafter, when appellant said he wanted to get his lawyer, the detectives told him to go get him. Appellant did not, but instead continued talking with the detectives. Appellant's subjective belief that he was under arrest and was not free to terminate the interview and leave the jury room is not relevant to our analysis. *See Dowthitt,* 931 S.W.2d at 254.

*12 Appellant's lawyer eventually arrived at the jury room. The lawyer was allowed into the jury room and he asked for a break to speak with appellant. When the lawyer asked if there was a warrant out for appellant, the detectives denied there was. The attorney then told the detectives that if appellant wanted to continue talking with them, the interview could continue after the break. The first interview ended at that point in time. The second interview started a few minutes later. Sergeant Holtke began the second interview by stating that appellant's attorney had told them that appellant wanted to continue talking with them. Appellant did not disagree and participated in the interview. At the end of the second interview, appellant was allowed to leave the jury room. The third interview occurred later the same day, when appellant exited the courthouse and voluntarily got into Holtke's vehicle to look at photo spreads. At the end of that brief interview, appellant was allowed to leave Holtke's vehicle.

The trial court found that appellant voluntarily participated in all of his interviews with the detectives investigating Veazie's murder. It further concluded that appellant was not in custody during the January 2009 statements. Applying the appropriate standard of review, we conclude that the record, summarized above, supports the trial court's conclusion that appellant's first January 2009 interview was not the product of a custodial interrogation. *See Turner,* 252 S.W.3d at 582. Because the first January interview was not a custodial interrogation, we need not further address whether appellant adequately invoked his right to counsel, which would have required the detectives to stop the interview until appellant

had the opportunity to talk with an attorney. *See Estrada v. State,* 313 S.W.3d 274, 296 (Tex.Crim.App.2010) ("The need to scrupulously honor a defendant's invocation of *Miranda* rights does not arise until created by the pressures of a custodial interrogation."). We therefore hold the trial court did not abuse its discretion when it denied appellant's motion to suppress his first January 2009 statement.

**C. The trial court did not abuse its discretion when it denied appellant's motion to suppress his December 2009 statement because he did not unambiguously invoke his right to counsel.**

Appellant next asserts that the trial court abused its discretion when it refused to suppress his December 3, 2009 statement. According to appellant, the trial court should have suppressed the December statement because (1) the statement was made during a custodial interrogation; (2) he did not waive his rights but instead adequately invoked his right to counsel during the January and December interviews; (3) the detectives then denied him access to an attorney; and (4) the detectives continued with the interview anyway.[5] According to appellant, the detectives' conduct violated his Fifth Amendment right to counsel. Appellant also argues that the trial court should have suppressed his December statement because he had previously invoked his right to counsel regarding another offense and he could not be approached regarding any other offense unless his counsel was present. In appellant's view, the fact the detectives approached him in December 2009 violated his Sixth Amendment right to counsel. We disagree that the detectives' handling of the December interview violated either appellant's Fifth Amendment or Sixth Amendment rights to counsel.

*1. Fifth Amendment right to counsel*

*13 The Fifth Amendment right to have an attorney present during any custodial police interrogation applies to any offense about which the police might want to question a suspect. *State v. Gobert,* 275 S.W.3d 888, 892 (Tex.Crim.App.2009). Among the rights about which the police must advise a suspect whom they have arrested is the right to have counsel present during any police-initiated interrogation. *Id.* Once the suspect in custody has invoked his Fifth Amendment right to counsel, police interrogation must cease until counsel has been provided or the suspect himself reinitiates the dialogue. *Edwards v. Arizona,* 451 U.S. 477, 484–85 (1981); *Gobert,* 275 S.W.3d at 892.

The State does not contest that appellant was in custody during the December interview and instead points out that the

trial court found he received the required warnings at the beginning of the interview. The State goes on to argue that appellant did not unambiguously invoke his right to counsel during the December interview. The State then contends that appellant voluntarily waived his rights when he answered "alright" to Sergeant Holtke's statement that he would explain why they were talking to him when appellant wanted to speak with them. We agree with the State.

We turn first to the question whether the record supports the trial court's conclusion that appellant waived his rights at the beginning of the December interview. Although appellant did not expressly state that he waived his rights at the beginning of the December interview, we conclude that he did so implicitly by responding "alright" and answering questions after being read his rights. *See Turner,* 252 S.W.3d at 583–84. The next question is whether appellant thereafter invoked his right to counsel, requiring the detectives to stop the interview. Because there was no unambiguous invocation of his right to counsel after he had implicitly waived his rights, we conclude that he did not.

Appellant points out that he asked at the beginning of the December interview, "I got a lawyer?" He argues this question was a sufficiently unambiguous invocation of his right to counsel that the detectives should have stopped the interview until he had had an opportunity to speak with an attorney.[6] But not every mention of a lawyer by a suspect will suffice to invoke the Fifth Amendment right to the presence of counsel during questioning. *Gobert,* 275 S.W.3d at 892. An ambiguous or equivocal statement with respect to counsel does not even require officers to seek clarification, much less halt their interrogation. *Id.* Whether the mention of a lawyer constitutes a clear invocation of the right to counsel will depend upon the statement itself and the totality of the circumstances. *Id.* The test is an objective one and the suspect must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. *Id.* at 892–93.

Based on the totality of the circumstances, we conclude that appellant's question was not a clear and unequivocal invocation of his right to counsel. *See Davis v. United States,* 512 U.S. 452, 462 (1994) (holding that statement "Maybe I should talk to a lawyer" was not request for counsel).[7] Because appellant's question did not clearly and unambiguously request counsel, the detectives were under no obligation to halt the interview or even to seek clarification from appellant. *Gobert,* 275 S.W.3d at 892. We conclude that the trial court did not err when it denied appellant's motion to

suppress his December statement to the extent it was based on the Fifth Amendment right to counsel.

### 2. Sixth Amendment right to counsel

*14 With regard to his Sixth Amendment right, appellant contends that once he had invoked his right to counsel on other charges, the police were not allowed to speak with him regarding the Veazie murder unless his attorney was present. We disagree.

The Sixth Amendment right to counsel is offense specific. *Rubalcado v. State,* 424 S.W.3d 560, 570 (Tex.Crim.App.2014). Thus, the right does not prevent the police from asking about an offense different from the offense regarding which the suspect has previously invoked his right to counsel.*Cobb v. State,* 85 S.W.3d 258, 263–64 (Tex.Crim.App.2002). "In other words, the invocation of the right *viz* one charge or prosecution does not encompass all future, yet distinct, offenses and prosecutions therefor." *Romo v. State,* 132 S.W.3d 2, 4 (Tex.App.–Amarillo 2003, no pet.). The critical inquiry for purposes of the Sixth Amendment right to counsel is whether the offenses are the same. *See Blockburger v. United States,* 284 U.S. 299, 304 (1932) (announcing test to determine whether offenses are the same); *Cobb,* 85 S.W.3d at 264; *Romo,* 132 S.W.3d at 4.

Here, appellant does not argue that the capital murder charge is the same as the other offenses regarding which he had previously invoked his right to counsel.[8] Therefore, appellant has not shown that the detectives violated his Sixth Amendment right to counsel when they interviewed him on December 9, 2009. We conclude that the trial court did not err when it denied appellant's motion to suppress to the extent the motion was based on the Sixth Amendment right to counsel. Having addressed and rejected each argument raised in appellant's third issue, we overrule that issue.

IV. The record on appeal contains a signed and certified Criminal Bill of Costs that supports the trial court's assessment of $614 in court costs against appellant.

In his fourth issue, appellant contends there is no bill of costs in the appellate record, and therefore the evidence supporting the trial court's assessment of court costs against him is insufficient. We review the assessment of court costs on appeal to determine whether there is a basis for the costs, not whether there was sufficient evidence offered at trial to prove each cost. *Johnson v. State,* 423 S.W.3d 385, 390

(Tex.Crim.App.2014). Traditional sufficiency-of-the-evidence standards do not apply. *Id.*

Generally, a bill of costs must (1) contain the items of cost, (2) be signed by the officer who charged the cost or the officer who is entitled to receive payment for the cost, and (3) be certified. *Id.* at 392–93; *see* Tex.Code Crim. Proc. Ann. arts. 103.001, 103.006 (West 2005). The record in this case contains a Criminal Bill of Costs signed and certified by the district clerk and a deputy clerk. The Criminal Bill of Costs lists the costs assessed, and the amount totals $614, the amount of court costs assessed against appellant. Under *Johnson,* a criminal bill of costs such as the one contained in the appellate record of this case provides a sufficient basis for the trial court's assessment of costs. *Id.* at 392–96. In addition, there is no requirement that the bill of costs be brought to the trial court's attention. *Id.* at 394. We therefore hold the Criminal Bill of Costs supports the assessment of $614 in court costs against appellant. We overrule appellant's fourth issue.

Conclusion

*15 Having addressed and rejected each of the issues raised by appellant, we affirm the trial court's judgment.

All Citations

Not Reported in S.W.3d, 2015 WL 3751776

Footnotes

1    *Miranda v. Arizona,* 384 U.S. 436 (1966).

2    Appellant explained that a "grip" means "a bunch of money."

3    Appellant also includes in his first issue an assertion that the trial court's admission of these photographs violated his right to a fair trial under the Eighth and Fourteenth Amendments to the United States Constitution. Appellant does not, however, support this assertion by providing appropriate citations to the record and legal authority in his discussion of the issue. We therefore hold he has waived this portion of the issue due to inadequate briefing. *See* Tex.R.App. P. 38.1(i).

4    Arguably, this review should include only trial evidence up to the point in the trial when the court made its final ruling on the suppression issue. We need not resolve this scope question, however, because the parties do not argue that it affects the outcome of our analysis in this case.

WestlawNext    © 2015 Thomson Reuters. No claim to original U.S. Government Works.    37

5    We already have determined that appellant was not in custody during the January interviews. Therefore, even if appellant unambiguously asked for an attorney during those interviews, the detectives were not obligated to provide appellant with an attorney or to terminate the interview at that time. *See Estrada v. State,* 313 S.W.3d 274, 296 n.26 (Tex.Crim.App.2010) (noting that the "defendant's remedy in a noncustodial setting where the police continue questioning the defendant after the defendant has unambiguously invoked his right to silence is to simply get up and leave ...").

6    This is the only reference to an attorney that appellant points out in his brief. We have listened to the entire recording of the December interview and conclude that this was the only time during the interview that appellant mentioned the word "lawyer" or "attorney".

7    *See also Mbugua v. State,* 312 S.W.3d 657, 665 (Tex.App.–Houston [1st Dist.] 2009, pet. ref'd) (holding that question "Can I wait until my lawyer gets here?" was not clear and unambiguous assertion of right to counsel); *Gutierrez v. State,* 150 S.W.3d 827, 832 (Tex.App.–Houston [14th Dist.] 2004, no pet.) (holding that question "Can I have [my attorney] present now?" was ambiguous and did not clearly and unequivocally invoke right to counsel); *Halbrook v. State,* 31 S.W.3d 301, 304 (Tex.App.–Fort Worth 2000, pet. ref'd) (holding that question "Do I get an opportunity to have my attorney present?" did not constitute clear and unambiguous invocation of right to counsel); *Flores v. State,* 30 S.W.3d 29, 34 (Tex.App.–San Antonio 2000, pet. ref'd) (holding that question "Will you allow me to speak to my attorney before?" was not clear and unambiguous invocation of right to counsel).

8    Appellant testified during his trial that his previous criminal charges included: (1) unauthorized use of a motor vehicle; (2) evading arrest in a motor vehicle; and (3) attempted injury to a child.

---

**End of Document** <span style="float:right">© 2015 Thomson Reuters. No claim to original U.S. Government Works.</span>